# EXHIBIT A

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
VICTOR HARARY,                              Civil Action No.

                    Plaintiff,


       -against-                            COMPLAINT


LOLLY TOGS LTD., RICHARD SUTTON             PLAINTIFF DEMANDS TRIAL
and ALFRED SUTTON,                          BY JURY OF ALL ISSUES.

                    Defendants.
- - - - - - - - - - - - - - - - - -X
```

Plaintiff, complaining of the defendant by his undersigned attorneys, **NOEL W. HAUSER AND ASSOCIATES**, respectfully alleges as and for his Complaint herein the following:

## JURISDICTION

1. The jurisdiction of this Honorable Court is invoked pursuant to the provisions of 28 U.S.C. 1332. The amount in controversy exceeds the sum of $75,000. The parties to this action are of diverse citizenship. Plaintiff is a citizen of the State of New Jersey and the defendants RICHARD SUTTON and ALFRED SUTTON are citizens of the State of New York. The defendant LOLLY TOGS LTD. is a corporation organized and existing under and by virtue of the laws of the State of New York, and maintains its principal offices within the State of New York.

1

**VENUE**

2. Venue of this action is properly placed within the Southern District of New York because most of the operative events giving rise to this litigation occurred within the Southern District of New York.

**FACTS**

3. Prior to the events hereinafter described, the plaintiff had for many years been engaged either as a principal or as an employee of another or others engaged in the sourcing of garments from abroad and importation and sale of such garments in the United States and elsewhere.

4. Prior to the events hereinafter described, the defendant LOLLY TOGS LTD. had been for many years engaged in the manufacture and production, either directly or through subsidiaries or affiliates, of garments and in the sale of such garments in the United States and elsewhere. The defendant LOLLY TOGS LTD. continues these activities to date.

5. At all times hereafter stated, the defendant RICHARD SUTTON was and now is the President and Chief Executive officer of the defendant LOLLY TOGS LTD.

6. At all times hereafter stated, the defendant ALFRED SUTTON was and now is an officer and principal of the defendant LOLLY TOGS LTD.

7. In approximately 2003, plaintiff formed a company to engage in the sourcing of garments to be offered for sale and sold to companies who wished or required their employees to be clothed in company uniforms.

8. Following its formation, the plaintiff created a business plan and developed a sales force, to solicit sales of such uniform garments, traveled abroad to locate factories capable of producing garments of the aforesaid description, established a place of business and otherwise made himself and his company ready to conduct business consisting of the sourcing and sale of uniforms in the United States.

9. In approximately the Spring of 2004, plaintiff was placed in contact with the defendant LOLLY TOGS LTD. as a source for funds willing to finance the production of uniforms to be sold by plaintiff's company. LOLLY TOGS LTD.'s representatives, including defendants RICHARD SUTTON and ALFRED SUTTON, advised plaintiff that defendant had had extensive experience in the sourcing and production of garments and that LOLLY TOGS LTD. was willing and able to provide the financing necessary to pay or provide security for the payment of factories to be engaged by plaintiff's company to produce uniforms to be sold to plaintiff's customers.

10. In approximately the Summer of 2004, the defendants RICHARD SUTTON and ALFRED SUTTON and other officers of the

defendant LOLLY TOGS LTD. proposed to the plaintiff the acquisition by defendant LOLLY TOGS LTD. of plaintiff's company and the engagement by plaintiff as President and Chief Executive Officer of that company which would become a new division of the defendant LOLLY TOGS LTD., which would be dedicated exclusively to the sourcing and sale of uniforms. The defendants proposed that LOLLY TOGS LTD. would acquire plaintiff's company for no consideration, but that LOLLY TOGS LTD. would engage plaintiff as President and Chief Executive Officer of a division to be formed for the sourcing and sale of uniforms for a term of five years certain for a stated minimum compensation and bonuses and additional compensation and appropriate funding, the agreement to negotiate in good faith a five year renewal after the first five year term, as well as bonuses and additional compensation, and appropriate funding for sourcing of product and cooperation in the development of what was to be the new division of the defendant LOLLY TOGS LTD. to be known as OFFICIAL WORK WEAR, which was to source, sell and distribute uniforms.

11.  On or about the 28th day of September, 2004, the plaintiff and defendant LOLLY TOGS LTD. entered into a so-called "Employment Agreement" annexed as Exhibit A, and concurrently therewith defendant LOLLY TOGS LTD. acquired plaintiff's company theretofore existing, Exhibit B.

12. Virtually from the beginning of plaintiff's engagement under the Agreement of September 28, 2004, the defendants RICHARD SUTTON and ALFRED SUTTON undermined the plaintiff in the performance of his duties:

    a. Shortly after the commencement of plaintiff's engagement, plaintiff generated an order for the production of garments to be sold by plaintiff's division through the sales force he had theretofore developed. The cost for production of these garments was in the neighborhood of $2 million. Contrary to plaintiff's specifications for these garments, they were chemically treated with formaldehyde and contained other cloth and manufacturing defects such that they were altogether substandard and unsaleable and even dangerous to market. The defendants nevertheless insisted that they would provide no financing or authorize the production of other uniforms unless and until the products described within this subparagraph were sold. Because the manufacturing and other defects were so pervasive, the defendant RICHARD SUTTON ultimately arranged for a sale of these garments for a total price of about $200,000.00, and plaintiff's division was

      internally charged for the loss.

b. Pending a sale of the garments described in subparagraph (a) above, the defendants discouraged the plaintiff's efforts to develop orders for uniforms and the defendants discouraged plaintiff's efforts to pursue engagements with factories willing and able to produce uniforms for sale by plaintiff's division at favorable landed prices.

c. Instead, the defendants insisted that garments to be sold by plaintiff's division would be made from cloth manufactured by Overseas mills owned or controlled, in whole or in part, by the defendants RICHARD SUTTON and/or ALFRED SUTTON; that the cloth so produced be manufactured into garments by Overseas factories owned or controlled by defendants RICHARD SUTTON and/or ALFRED SUTTON and their affiliates. The garments so produced and manufactured for sale by plaintiff's division were at prices significantly greater than other merchandise available from independently owned and operated mills and factories.

6

  d. The defendants RICHARD SUTTON and ALFRED SUTTON directed the plaintiff to have his division refrain from competing in the sale of uniforms in competition with other leading manufacturers of uniforms and to limit sales efforts to smaller users of such garments.

  e. The separate as well as the cumulative effect of the foregoing was to demoralize plaintiff's sales force, who were required to insist upon prices which were excessive, and to offer merchandise often unsuitable and, for the most part, late for delivery dates promised to customers.

  f. The defendants, their agents, servants and employees engaged in similar conduct whose design or effect was to undermine the efforts of plaintiff to develop his division created by the Employment Agreement of September 23, 2004.

13. On or about the 18th day of June, 2007, plaintiff's employment engagement was terminated on pretextual grounds.

## COUNT I

14. The termination of plaintiff's employment was in violation of the terms of the Employment Agreement of September 28, 2004 between the parties and was generated by a lack of good

7

faith on the part of the defendants.

15.  As a result of the violation by defendant LOLLY TOGS LTD. of the Employment Agreement of September 28, 2004, plaintiff has been damaged in the sum of not less than $1.5 million.

**COUNT II**

16.  The acts and conduct of the defendant LOLLY TOGS LTD., by its agents, servants and employees constituted a violation by the defendant LOLLY TOGS LTD. of the covenant of good faith implicit in the aforesaid Employment Agreement by which the defendant LOLLY TOGS LTD. implicitly agreed to refrain from committing any act which would impede or impair the discharge by plaintiff of his duties under the terms of his Employment Agreement.

17.  As a result of the violation by defendant LOLLY TOGS LTD. of the Employment Agreement of September 28, 2004, plaintiff has been damaged in the sum of not less than $1.5 million.

**COUNT III**

18.  To the extent the defendants RICHARD SUTTON and ALFRED SUTTON insisted that garments to be produced for sale by plaintiff's division were to be produced by mills and factories owned in whole or in part by defendants RICHARD SUTTON and/or ALFRED SUTTON, and their associates, the aforesaid defendants

8

undermined plaintiff's ability to discharge his duties as called for by his Employment Agreement of September 28, 2004.

19. By reason of the aforesaid acts of the defendants RICHARD SUTTON and ALFRED SUTTON, they induced the defendant LOLLY TOGS LTD. to pretextually terminate plaintiff's Employment Agreement.

20. As a consequence of the acts of the aforesaid defendants, plaintiff has been damaged in the sum of at least $1,500,000.00.

**WHEREFORE**, plaintiffs demand Judgment against the defendants as follows:

   a. As to **COUNT I** and **COUNT II**, the sum of not less than $1.5 million as against the defendant LOLLY TOGS LTD.;

   b. As to **COUNT III**, the sum of not less than $1.5 in compensatory damages and $750,000.00 additional in punitive damages; and

   c. The costs and disbursements of this action and counsel fees.

DATED:   New York, New York
         August 31, 2007

Respectfully submitted,

NOEL W. HAUSER AND ASSOCIATES

By_____
     Noel W. Hauser
Attorneys for Plaintiff
270 Madison Avenue - 13th Fl.
New York, New York 10016
212   688-6400

9

EXHIBIT A

# EMPLOYMENT AGREEMENT

This agreement is made the 28 day of September, 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is 105 Hollywood Avenue, West Long Branch, New Jersey 07764-1836, ("Employee").

The parties hereto, in consideration of the premises and mutual agreements hereinafter set forth, agree, jointly and severally, as follows:

## Section I

### Nature of Employment

1.1 Employer does hire and employ Employee as a **Division President** and Employee does accept and agree to such hiring and employment. Subject to the supervision and pursuant to the orders, advice, and directions of Employer and its management, Employee shall perform the responsibilities listed herein, and shall perform such other duties as are customarily performed by one holding such position in other similar businesses or enterprises as that engaged in by Employer, and shall also additionally render such other and unrelated services and duties as may be reasonably assigned to Employee from time to time by Employer.

1.2 Responsibilities:

Employee acknowledges that Employee's primary responsibility is to

a. Employee further agrees to use his best efforts to manage, generally, and obtain bona fide orders (domestic and international) for the purchase of merchandise from LollyTogs's new "Original Workwear"[1] industrial uniform division (the "Division") from all channels of distribution.

b. Employee agrees to formulate sales strategy and establish prices, subject to the reasonable approval of Employer. Employee shall coordinate outside sales representatives and secure written terms with each, subject to the approval of LollyTogs.

c. Employee shall work full time. Employee agrees to maintain typical business records at such location.

d. Employee agrees to travel, both domestic and overseas (business class only for flights exceeding 7 hours or as otherwise allowed by Employer's travel policy) as is necessary to support the sales of the product line. Employee agrees to attend all relevant trade shows, as reasonably planned by Employer with Employee's due.

## Section II

### Manner of Performance of Employee's Duties

2.1 Employee agrees to perform, at all times faithfully, industriously, and to the best of his ability, experience, and talent, all of the duties that may be required of and from him pursuant to the express and implicit terms of this agreement, to the reasonable satisfaction of Employer.

## Section III

### Devotion by Employee of Full Time to Business

3.1 Employee shall devote all his time, attention, knowledge, and skill solely and exclusively to the business and interest of Employer, and Employer shall be entitled to all of the benefits, profits, or other issues arising from or incident to any and all work, services, and advice of Employee, and Employee expressly agrees that during the term of this agreement he will not be interested, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, Employee, or in any other form or capacity, in any other business similar to Employer's business or any allied trade.

---

[1] If "Better Workwear" becomes available, Harary will use best efforts to assign.

## Section IV

### Payment and Reimbursement for Full-Time Employment

4.1 So long as Employee is working full time for Employer, Employer shall pay Employee and Employee agrees to accept from Employer, in full payment for Employee's services under this agreement, compensation at the rate of $185,000.00 per annum, payable weekly ("Base Salary"). Employer will provide medical insurance for Employee and Employee's immediate family members under the guidelines of Employer's medical coverage policy ("Health Insurance Coverage"). This coverage will begin no sooner than _____ from the commencement of Employee's full-time employment.

4.2 In addition, Employer agrees that it will reimburse Employee for any and all necessary, customary, and usual expenses incurred by him while traveling for and on behalf of the Employer pursuant to Employer's directions. Employer may request proof of payment or a request for prior approval for all expenses as a condition to reimbursing Employee.

4.3 "Gross Profit Bonus": In addition to the compensation set forth above, Employee shall receive, as an annual bonus for each fiscal year beginning August 1, 2004 (i) 6% of the Employer's gross profit (as such term is defined by Generally Accepted Accounting Principals) resulting from sales that are taken by the Division and for its products and that are paid for by the customer. This shall be paid quarterly, but subject to an annual cumulative adjustment. The parties agree that the Gross Profit Bonus shall in no event be less than one percent (1%) of the Division's Net Sales. "Net Sales" shall exclude any and all costs associated with shipping, handling, insurance, sales taxes, allowances, discounts, refunds, adjustments, chargebacks, and/or similar fees, costs and expenses.

4.4 [Deleted.]

4.5 Further, after the first full fiscal year after the execution of this Agreement (or eighteen calendar months from such date, whichever is later), if sales (booked, shipped and paid) for the Division exceed ten million dollars ($10,000,000.00) during such fiscal year or eighteen (18) calendar months from such date, whichever is later, Employer shall pay Employee a one-time bonus of $100,000.00, payable within 30 days after such figures are certified by Employer's certified public accountants or chief financial officer, which shall not be unduly delayed.

## Section V

### Duration of Employment; Termination for Cause

5.1 The term of this agreement shall commence on the date set forth above and terminate at midnight on July 31, 2009. Sixty (60) days prior thereto, the parties hereto agree to negotiate a five (5) year renewal term, to be mutually agreed upon. If, for any reason (including termination for cause), this agreement is terminated or the employment of Employee is not renewed or extended after the initial five-year term, Employee shall receive a severance equal to the prior two (2) full year's Gross Profit Bonus, or the prior one (1) year's Base Pay, whichever is greater.

5.2 Employee agrees to execute Employer's standard Sexual Harassment Policy and Internet and Email Policy, and agrees to abide by any Employment Manual of either Employer or the Company.

5.3 Termination for Cause. Notwithstanding any provision of this Agreement to the contrary, the Employer may terminate Employee's employment by written notice of termination to Employee upon the following events:

   a. The Division does not generate two million dollars ($2,000,000.00) in sales (booked, shipped and paid) (unless as a result of the Employer's inability to manufacture only) during any full fiscal year during which this Agreement is in effect, beginning August 1, 2005;

   b. Employee's breach of any material obligation under the terms of his employment agreement with the Employer and failure to cure such breach within fourteen (14) days after written notice of breach from the Employer;

   c. Employee's neglect or failure to carry out his duties as determined in the reasonable discretion of the directors or managers of the Employer and failure to cure such neglect or failure within fourteen (14) days

    after written notice of breach from the Employer;

d. Employee's voluntary resignation;

e. Employee's being named in a lawsuit relating, directly or indirectly, to Steve Haber ("Haber") or DFM other than the pending litigation in the Superior Court of the State of New Jersey, Docket No. _____ or any successor suit thereto (the "Haber Suit");

f. Employee's conviction of a felony or crime of moral turpitude; or

g. Employee's commission of any act or omission to take any act which reasonably could be expected to have a material adverse effect on the business of the Employer or injures its reputation.

### Section VI

### Option To Terminate Contract for Permanent Disability of Employee:

6.1 Notwithstanding anything in this agreement to the contrary, Employer has the option to terminate this agreement in the event that during its term Employee shall become permanently disabled as the term permanently disabled is defined below. Such option shall be exercised by Employer giving notice to Employee by registered mail of its intention to terminate this agreement on the last day of the month during which such notice is mailed, and on the giving of such notice this agreement and the term of this agreement come to an end on the last day of the month in which the notice is mailed, with the same force and effect as if that day were originally set forth as the termination date of Employee's employment. For the purposes of this agreement, Employee shall be deemed to have become permanently disabled if, during any year of the term of this agreement, because of ill health, physical or mental disability, or for other causes beyond his control, he shall have been continuously unable or unwilling or have failed to perform his duties under this contract for 45 consecutive days, or if, during any year of the term of this agreement, he shall have been unable or unwilling or have failed to perform his duties for a total period of 90 days, either consecutive or not. For the purposes of this agreement, the term 'any year of the term of this agreement' is defined to mean any period of 12 calendar months commencing on the date of execution and each anniversary year thereafter. Employee shall receive long-term disability benefits in accordance with Employer's Senior Executive plan and agrees to comply with the terms and conditions of such plan.

### Section VII

### Discontinuance of Business or Division as Termination of Employment

7.1 Notwithstanding anything in this agreement to the contrary, in the event that Employer or its affiliates shall discontinue operating the Division, then this agreement will terminate as of the last day of the month in which Employer ceases such operations. In such a case, severance compensation and bonuses will apply, and the non-complete applicable to the Division's business only shall not apply to Employee. This paragraph shall survive termination of this Agreement.

### Section VIII

### [Omitted.]

### Section IX

### Nondisclosure of Information Concerning Business, Non-Competition and Non-Solicitation

9.1 Confidential Information. Employee acknowledges and agrees that Employee has and will come into contact with, have access to and learn various technical and non-technical trade secrets and other Confidential Information, which are the property of Employer. Such Confidential Information includes but is not limited to methods, procedures, devices and other means used by Employer in the conduct of its business, marketing plans and strategies, pricing plans and strategies, data processing programs, databases, including, but not limited to plans and strategies relating to the design, marketing and pricing of Employer's products, all of which Confidential Information is not publicly available; names and addresses of Employer's customers and their representatives responsible for entering into contracts for Employer's services, customer leads or referrals, specific customer needs and requirements and the manner in which they have been met by

Employer, information with respect to pricing, costs, profits, sales, markets, plans for future business and other development, all of which Confidential Information is not available from directories or other public sources; and information with respect to Employer's employees, their names and addresses, compensation, experience, qualifications, abilities, job performance and similar information. All of the Confidential Information has been developed, acquired or compiled by Employer at its great effort and expense.

9.2 <u>Non-Disclosure of Confidential Information</u>. Employee acknowledges and agrees that any disclosure, divulging, revealing or other use of any of the aforesaid Confidential Information by the Employee, other than in connection with LollyTogs's business will be highly detrimental to the business of LollyTogs and serious loss of business and pecuniary damage may result therefrom. Accordingly, Employee specifically covenants and agrees to hold all such Confidential Information and any documents containing or reflecting the same in the strictest confidence, and Employee will not, both during employment with LollyTogs or thereafter, without LollyTogs's prior written consent, disclose, divulge or reveal to any person whomsoever, or use for any purpose other than the exclusive benefit of LollyTogs, any Confidential Information whatsoever, whether contained in the Employee's memory or embodied in writing or other physical form.

9.3 <u>Non-Solicitation of Customers and Business Contacts.</u> Employee acknowledges and agrees that during the course and solely as a result of his relationship with LollyTogs, he has and will become aware of some, most or all of LollyTogs' customers and clients, their names and addresses, their representatives responsible for purchasing LollyTogs' goods and/or services, their specific needs and requirements, and leads and referrals to prospective customers and clients, as well as suppliers, other employees and other business contacts with which LollyTogs has a business relationship (a "Business Contact"). Employee further acknowledges and agrees that the loss of such customers and clients or Business Contacts would cause LollyTogs great and irreparable harm. Consequently, Employee covenants and agrees that in the event of the termination of his relationship with LollyTogs, whether voluntarily or involuntarily, Employee will not, for a period of two (2) years following the date of termination, directly or indirectly solicit, for the purpose of selling or marketing similar goods and/or services to any customer, former customer or prospective customer of LollyTogs, or any Business Contact, with whom Employee came into contact while employed by LollyTogs. Employee shall not request or require any of the Business Contacts to cancel, reduce or otherwise modify any such business relationship.

9.4 <u>Non-Solicitation of Employees and Personnel</u>. Employee acknowledges and agrees that during the course of employment by LollyTogs, Employee has and may hereafter come into contact with some, most or all of LollyTogs's other employees or consultants, their knowledge, skills, abilities, salaries, commissions, benefits and other matters with respect to such employees not generally known to the public. Employee further acknowledges and agrees that any solicitation, luring away or hiring of such employees of LollyTogs will be highly detrimental to the business of LollyTogs and will cause LollyTogs serious loss of business and great and irreparable harm. Consequently, Employee covenants and agrees that during the course of employment by LollyTogs and for a period of three (3) years after termination of such employment (whether such termination is voluntary or involuntary), Employee shall not directly or indirectly, on behalf of Employee or another, solicit lure or hire any employees or consultants of LollyTogs of whom Employee became aware while employed by LollyTogs, or assist or aid in any such activity.

9.5 <u>Non-Competition.</u> Employee agrees that during the course of his employment with LollyTogs and for a period of two (2) years following the cessation of his employment with LollyTogs for any reason, he shall not, directly or indirectly, enter into or engage in the ownership, management, operation or control of, or act as an employee, advisor, consultant or contractor for any person, company or entity engaged in business similar to that of LollyTogs anywhere in the United States or Canada. This non-compete shall not apply to non-uniform apparel marketed to men and women.

9.6 <u>Conflict of Interest</u>. Employee may not use his position, influence, knowledge of Confidential Information or LollyTogs assets for personal gain. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, customer or prospective customer without disclosure and written approval from the President of LollyTogs, Ltd. is strictly prohibited and constitutes cause for dismissal and a claim for damages.

## Section X

### Commitments Binding on Employer Only on Written Consent

10.1   Anything contained in this agreement to the contrary notwithstanding, it is understood and agreed that Employee shall not have the right to make any contracts or commitments for or on behalf of Employer without the written consent (including email) of Employer.

## Section XI

### Contract Terms To Be Exclusive

11.1   This written agreement contains the sole and entire agreement between the parties and shall supersede any and all other agreements between the parties. The parties acknowledge and agree that neither of them has made any representation with respect to the subject matter of this agreement or any representations inducing its execution and delivery except such representations as are specifically set forth in this writing and the parties acknowledge that they have relied on their own judgment in entering into the same. The parties further acknowledge that any statements or representations that may have been made by either of them to the other are void and of no effect and that neither of them has relied on such statements or representations in connection with its dealings with the other.

## Section XII

### Waiver or Modification Ineffective Unless in Writing

12.1   It is agreed that no waiver or modification of this agreement or of any covenant, condition, or limitation contained in it shall be valid unless it is in writing and duly executed by the party to be charged with it, and that no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this agreement, or the rights or obligations of any party under it, unless such waiver or modification is in writing, duly executed as above. The parties agree that the provisions of this paragraph may not be waived except by a duly executed writing.

## Section XIII

### [Omitted]

## Section XIII

### Miscellaneous

14.1   <u>Contract Governed by Law of State of New York.</u> The parties agree that it is their intention and covenant that this agreement and performance under it and all suits and special proceedings relating to it be construed in accordance with and under and pursuant to the laws of the State of New York and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this agreement, the laws of the State of New York shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

14.2   <u>Severability.</u> If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect.

14.3   <u>Enforcement of Covenants</u>. Employee acknowledges and agrees that compliance with this Agreement is necessary to protect the business and goodwill of LollyTogs and that any breach of this Agreement or any subparagraph hereof will result in irreparable and continuing harm to LollyTogs, for which money damages may not provide adequate relief. Accordingly, in the event of any breach or anticipatory breach of this Agreement by Employee, LollyTogs and Employee agree that LollyTogs shall be entitled to the following particular forms of relief as a result of such breach, in addition to any remedies otherwise available to it at law or equity: (a) injunctions, both preliminary and permanent, enjoining or restraining such breach or

anticipatory breach, and Employee hereby consents to the issuance thereof forthwith and without bond by any court of competent jurisdiction; and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by LollyTogs to enforce the provisions of this Agreement.

14.4    <u>Survivorship of Benefits</u>. This agreement shall inure to the benefit of the Employer's successors and assigns.

14.5    <u>Authority.</u>  Employee warrants and represents that he has the authority to enter into this Agreement and that no other agreements, covenants, or representations affect in any way Employee's unfettered right to enter into this Agreement and to act in accordance herewith.

14.6    <u>Further Actions.</u>  From time to time from after the date hereof, each party, at its expense and without further consideration, will execute and deliver such documents to the other party as the other party may reasonably request in order to more effectively consummate the transaction contemplated herein.

IN WITNESS WHEREOF, the undersigned have executed this Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By _____
Richard Sutton

**Employee:**
VICTOR HARARY
_____

EXHIBIT B

This letter agreement is made the 28 day of September, 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is _____, _____, ("Employee"), and is made in conjunction with that certain Employment Agreement of the same date.

Re:  LollyTogs and Victor Harary Employment Agreement
     Side Letter: Business of Duty Free Manufacturers, Ltd.; Intellectual Property; Indemnity

1. The parties agree that as a condition to the Employment Agreement and the employment contemplated therein:

   a. The business heretofore owned by Employee, Duty Free Manufacturers, Ltd. of Red Bank, New Jersey ("DFM"), be dissolved and all agreements between it and Employer to this date which may obligate Employer in any way be terminated and released, such dissolution to be effective no later than thirty (30) days from the date set forth above, or promptly upon a judgment or settlement of the Haber Suit (as such term is defined in the Agreement).

   b. All intellectual property of Employee and DFM, including their trademarks, copyrights and designs set forth on the attached Exhibit A, be assigned to the Employer.

   c. All third party salesperson contracts involving DFM be disclosed to Employer for evaluation and assumption. Annexed hereto as Exhibit B is a list of all such agreements.

2. Employee represents and warrants that he is a shareholder of DFM and has authority to enter into the Agreement and to make the representations contained herein.

IN WITNESS WHEREOF, the undersigned have executed this Letter Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By  _____
    Richard Sutton  or (JJA)

**Employee:**

VICTOR HARARY
_____

7

CASE NO.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

VICTOR HARARY,

                                        Plaintiff,

-against-

LOLLY TOGS LTD., RICHARD SUTTON and ALFRED SUTTON,

                                        Defendants.

---

SUMMONS AND COMPLAINT

---

**NOEL W. HAUSER AND ASSOCIATES**
Attorneys for Defendants
270 Madison Avenue
13th Floor
New York, New York 10016
212-688-6400