UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

VICTOR HARARY,

                     Plaintiff,

          -against-

LOLLY TOGS LTD., RICHARD SUTTON
and ALFRED SUTTON,

                   Defendants.

- - - - - - - - - - - - - - - - - -X

Civil Action No.
07 CIV 7878
(PATTERSON, J.)

**AFFIDAVIT IN OPPOSITION**

**STATE OF NEW YORK**    )
                ) **ss.:**
**COUNTY OF NEW YORK**  )

    **VICTOR HARARY**, being duly sworn, deposes and says:

    1.    I reside at West Long Branch, New Jersey, and I am the plaintiff herein.

    2.    I have knowledge of the facts and circumstances hereafter set forth and I submit this affidavit in opposition to the motion of the defendants for dismissal of the Complaint pursuant to Federal Rule 12(b)(6).

1

## I.

### Introduction

3.    I am fifty four years of age.    Over the past dozen or more years and until 2004, I was engaged in the sourcing, primarily from factories abroad, and sale in the United States of garments, primarily to major retailers such as GAP Stores, Target and Mervyn's.  During a large portion of this period, I was the principal of my own company.   My sales of garments, whether for my own company, or for other companies by which I was from time to time employed, amounted to millions of dollars per annum.

## II.

### Development of Industrial Uniform Trade

4.    In approximately 2003, I developed with associates a business plan by which industrial uniforms would be manufactured abroad pursuant to specifications agreed on with customers and sold to customers within the United States including, in particular, industrial laundries which provide uniforms and cleaning of uniforms to industries requiring such products and services.

5.    My development of the plan required me to research and identify fabric for use in garments which would withstand industrial use and repeated industrial washings in industrial laundries; it required the identification of factories abroad

which had the capacity and ability to produce such garments; and, of course, it was necessary to identify industrial users, including, in particular, industrial laundries to which manufactured garments could be offered and sold.

6.    Eventually, I engaged a staff of qualified individuals to develop the proper fabric; to design the garments; to identify a customer base; and I, myself, traveled abroad to locate factories which could produce the garments at prices which would permit competitive sale of the garments to customers.

7.    As I investigated further, I realized that the prospects for profits of such a venture were enormous, but that it required me to identify capital or "seed money" to bridge the gap between production and receipt of funds from the sale of products.

### III.

### Introduction to Lolly Togs Inc.

8.    In or about early 2004, I was introduced to one or more of the principals of the defendant Lolly Togs Inc., which was and is a well established producer and supplier of uniform garments for children, as a potential source for "seed money".

9.    By March 2004, the principals of Lolly Togs expressed interest in providing "seed money" for our venture in the form of seven-figure Letters of Credit to be issued to our potential Overseas producers of fabric and manufacturers of garments. However, before making any commitment, the principals of Lolly Togs Inc. insisted upon being furnished with detailed proprietary and confidential information concerning our activities during the preceding period and our plans for production and sale of industrial garments.

10.    Since this information represented months of time, toil and treasure, we insisted upon, and received a Non-Disclosure Agreement from Lolly Togs before furnishing our confidential proprietary information.    A copy of the Non-Disclosure Agreement and Non-Competition Agreement signed by me in behalf of my company, Duty Free Manufacturers Ltd. and by a principal of Lolly Togs Inc. is annexed as Exhibit A.

11.    Following receipt of the executed agreement, we furnished the information contemplated as requested by Lolly Togs.

12.    Negotiations for the issuance by Lolly Togs of Letters of Credit thereafter proceeded.

IV.

## The Agreement of September 29, 2004

13.    There came a time during the course of our negotiations for Letters of Credit to be provided by Lolly Togs that Lolly Togs proposed that the venture take a different form: Lolly Togs contended that it would be easier for its own financial purposes if our company were to operate as an autonomous division of Lolly Togs, rather than as a separate company with Lolly Togs simply providing financing in the form of Letters of Credit.

14.    Based upon my understanding that I and my employees and associates would operate autonomously from Lolly Togs, I entered into serious negotiations for a non-cancelable long term Employment Agreement and the sale of my company, including all intellectual property, for me to produce and sell industrial uniforms as a wholly autonomous division of Lolly Togs.

15.    Such Agreement was prepared and signed by a representative of Lolly Togs Inc. and countersigned by me on or about September 28, 2004, and a copy of the same is annexed as Exhibit B.

16.    This Honorable Court will observe the transfer by me of all property of Duty Free Manufacturers Ltd., including all intellectual properties, of which a copy is annexed as Exhibit C.

5

**V.**

## EVENTS FOLLOWING THE EXECUTION OF
## EMPLOYMENT AGREEMENT OF SEPTEMBER    , 2004

17.    Promptly following the execution of the Employment Agreement, which called for me to act as President of the newly created division (which I understood would assure me of my own autonomous operation of the division), Joseph Sutton, one of the principal officers of Lolly Togs Inc., insisted upon identifying himself as "Chief Executive Officer" of my division.

18.    From that point forward, he and the other principals of Lolly Togs Inc. (about a dozen in all including Joseph Sutton, the defendant Richard Sutton, and their father, the defendant Alfred Sutton) systematically undermined and frustrated my authority to conduct the affairs of the division.

19.    First of all, I was advised that all products of my division would be required to be ordered through the Lolly Togs central buying office which buys or arranges for production of garments for approximately a half dozen subsidiaries and divisions of Lolly Togs.   The Lolly Togs central buying office routinely overrode our requests for sourcing of fabric and production of garments, selecting almost invariably several Asian garment manufacturers, wholly or partially owned by one or more of the principals of Lolly Togs, including, as I am advised, defendants Richard Sutton and Alfred Sutton.

6

20.    Prices and delivery schedules were fixed, not by anybody in my division, but rather by the Lolly Togs central buying office.  As a consequence, the garments produced were of shoddy manufacture, made from fabric which was shoddy and in some instances, containing excessive amounts of formaldehyde, leaving the products altogether unsaleable.

21.    Requests for customers' demands as regards delivery schedules were routinely ignored, where prompt delivery of industrial uniforms is of major concern.

22.    Furthermore, I was advised early on by the defendant Richard Sutton that my division should not compete or attempt to compete with Red Kap, the largest industrial uniform supplier in the United States.   It seems that Lolly Togs had theretofore acquired a company known as Health Tex from Vanity Fair.  Vanity Fair is the owner of Red Kap; Richard Sutton was desirous of purchasing additional divisions or companies and licenses from Vanity Fair; and he did not wish for my division to compete with Red Kap.   Instead, I was told that we should limit our sales efforts to small users and to sell from stock rather than attempt to obtain and fill pre-sold orders for industrial uniforms as had originally been planned.

23.    These changes vastly impeded and prevented the normal growth and development of my division, Official Work Wear. Nevertheless, despite serious impediments we continued our

efforts and were turning the corner toward profitability in 2007.

24.    In June 2007, we conducted a sales meeting in Las Vegas, Nevada, attended by Joseph Sutton, the sales representatives of my division located throughout the United States, and I, amongst others.  The reports from the field were most encouraging and Joseph Sutton made a speech which encouraged the efforts of our sales representatives.  The meetings lasted several days.

25.    On or about June 15, 2007, I was instructed to attend at the office of Richard Sutton, where I was told that Lolly Togs Inc. had decided to terminate operations of my division, effective immediately.  I was instructed to return all keys forthwith and was not even permitted to go to my office to remove my personal belongings; some, but not all of the members of my staff were also discharged.

26.    At the same time I was presented with a proposed "SEPARATION AGREEMENT", copy annexed as Exhibit D.  The attention of this Honorable Court is respectfully invited to paragraph 1 of the "SEPARATION AGREEMENT" which refers to paragraphs 9.1 through 9.5 of the Employment Agreement.  Thus, the "SEPARATION AGREEMENT" terminating my relationship with Lolly Togs Inc., and would prohibit me from competing with Lolly Togs.

27.    I was most puzzled by the inclusion of these provisions in the agreement proposed by Lolly Togs Inc., which

supposedly was discontinuing the conduct of business theretofore conducted by my division; that is, the manufacture and sale of industrial work wear, a class of garments never offered for sale by Lolly Togs or any division thereof until the time of my association with Lolly Togs.

28.   This was particularly true because the sales volume of industrial uniforms in the United States amounts to many billions of dollars per annum and it is inconceivable that Lolly Togs Inc., having entered into the business, would fail to follow up.

29.   Obviously, I never signed the proposed Separation Agreement.

30.   My suspicions were, of course, correct.   The Lolly Togs corporate officers have advised at least some of the sales representatives recruited by me to continue to solicit "pre-booked orders" (meaning orders for merchandise to be produced in futuro as opposed to existing inventory); that my division was being re-structured to thereafter operate under the direction of Joseph Sutton, a brother of defendant Richard Sutton.

31.   In this connection, I respectfully submit the affidavit of JEFFREY SMITH, duly sworn to the 19th day of October, 2007, a sales representative I recruited to work for my division in the Western States, in which he confirms having been advised last month by Lolly Togs management that my division is being "re-structured" and that he should be soliciting for orders

9

not only from existing inventory, but orders to be produced in futuro.

32.   Should there be any doubt whatever that Official Work Wear is alive and well, I annex hereto as Exhibit E a page from the Official Work Wear website dated October 31, 2007, identifying Official Work Wear's "GLOBAL COMPLIANCE", stating in pertinent part, that:

> "We expect these same commitments to be shared by all manufacturers of Official Workwear merchandise." [Underscoring added.]

33.   Annexed as Exhibit F is another current page taken from the Official Work Wear website on October 31, 2007, stating in pertinent part that:

> "Official Workwear is a global manufacturer with company-dedicated manufacturing partners * * *" [Underscoring added.]

34.   Further, to add insult to injury, I am carried on the Official Work Wear website as the President of Official Work Wear (see Exhibit F).

35.   Annexed as Exhibit G is another page from the Official Work Wear website dated October 31, 2007, stating in pertinent part that:

> "We are currently developing products to expand our collections to include security, corporate and health apparel." [Underscoring added.]

36.    Finally, the Court should be advised that I have received no compensation, severance pay, or other funds whatever from the date of my discharge until the current writing.

37.    The motion to dismiss should be denied.

_____
VICTOR HARARY

**SWORN TO BEFORE ME THIS**
**30th day of October, 2007**

_____
**NOTARY PUBLIC**

Estelle Ginsberg
Notary Public, State of New York
No. 01Gi4728346
Qualified in Queens County
Commission Exp. Nov. 30, 2000    2010

11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

VICTOR HARARY,                                    Civil Action No.
                                                  07 CIV 7878
                              Plaintiff,          (PATTERSON, J.)


        -against-                                 **AFFIDAVIT**


LOLLY TOGS LTD., RICHARD SUTTON
and ALFRED SUTTON,

                              Defendants.

- - - - - - - - - - - - - - - - - -X

**STATE OF NEW YORK**   )
                        ) **ss.:**
**COUNTY OF NEW YORK**  )


        **JEFFREY SMITH**, being duly sworn, deposes and says:

        1.    I reside at 4928 Mission Boulevard, San Diego,
California 92109.

        2.    In approximately September 2006, I was recruited by
Victor Harary, then the President of Official Work Wear in New
Jersey to act in behalf of the company in selling industrial
uniforms to industrial laundries, resellers and retailers in
California, Arizona, Nevada, Washington, Oregon and Alaska.

        3.    My only contact with the company until June 2007 was
with Victor Harary and his assistant or assistants.

4.    I was invited to attend, and attended a sales meeting of all of the representatives of Official Work Wear at the Hilton Hotel in Las Vegas in approximately mid-June 2007.

5.    At that time I met, amongst others, Joseph Sutton, who I understood was an important executive in the company, as well as his assistant "J. Lee" Lineburgh.   This meeting covered a period of several days during the course of which we met with representatives of national and regional industrial laundries. Amongst others, we spent extensive periods of time with Prudential Company, an industrial laundry which purchased uniforms at the rate of approximately $13 million per annum.   We also met with a company which produces fire retardant fabric which Official Work Wear was about to commence to manufacture.

6.    The sales representatives were encouraged to continue with our efforts and we were told in substance by, amongst others, Joseph Sutton, that the sales representatives could earn up to $500,000.00 per annum in representing Official Work Wear.

7.    Several days later I received a telephone call from Joseph Sutton, advising me that the company was being closed.

8.    At that time I had price commitments for orders from customers amounting to approximately $21 million, and I was accordingly very upset.

9.    I went on a brief vacation immediately following my receipt of this news.

10.    On my return about two weeks thereafter, I placed a call to Mary Beth Sweeney at the Official Work Wear office in New Jersey.    I was told that the company was being "re-structured" and that the company would thereafter operate under the direction of Joseph Sutton, with J. Lee to be in charge of day-to-day affairs.

11.    I spoke to "J. Lee" at approximately the same time and he confirmed to me that he was in charge of "re-structuring" the company together with Joseph Sutton, to whom he reported.    I was instructed to continue to solicit for the sale of industrial uniforms, not only of merchandise in stock, but to attempt to obtain "pre-booked orders", that is, orders for industrial uniforms to be thereafter manufactured in 120 days and delivered to industrial users, particularly Prudential and Mission Linen.

12.    From that time until the present, I have been engaged in the solicitation of "pre-booked orders" for industrial uniforms, as well as uniforms in stock from industrial laundries, resellers and retailers.

13.    I have read the foregoing and certify that the statements are true and correct.

_____
                                                JEFFREY SMITH

SWORN TO BEFORE ME THIS
19th DAY OF October, 2007

_____
        NOTARY PUBLIC

NOEL HAUSER
Notary Public, State of New York
No. 02HA1710990
Qualified in Queens County
Commission Expires September 30, 2008

**EXHIBIT A**

Duty-Free Manufacturers Ltd.
125 Half Mile Road
Suite 200
Red Bank, NJ 07701

## NON-DISCLOSURE, NON COMPETE AGREEMENT

AGREEMENT dated as of the 31st Day of March 2004 by and between Duty Free Manufacturers Ltd (DFM) having its principal offices at 125 Half Mile Road, Suite 200, Red bank NJ 07701 and Lollytogs Ltd. having its office at 100 West 33rd Street, Suite 1012, New York NY 10001 and all other affiliated companies, their officers, assigns or agents.

## WITNESSED:

WHEREAS, DFM has asked Lollytogs Ltd. to provide confidentiality with respect to certain information, samples and data deemed proprietary, confidential and relating to the operations, products, and/or technology of DFM including but not limited to:

1- Industrial Work Apparel (pants, shirts, coveralls, jackets)
2- Executive Apparel (oxford shirts, dress shirts, business casuals)
3- Chef Apparel (kitchen, chef)
4- Safety Apparel (flame resistant, fluid resistant, clean-room/static dissipative, hi-visibility)
5- Health Apparel (lab coats, scrubs, gowns)
6- Work Uniforms for Men/Women (Adults)

NOW, THEREFORE, the parties hereto agree as follows:

1.  **Confidential Information.** For the purposes of this Agreement, "Confidential Information" shall mean oral, written, data and samples of a proprietary and confidential nature received by Lollytogs Ltd. and all other affiliated companies, their officers, assigns and agents from DFM.

2.  **Confidentiality.** Commencing on the date hereof, Lollytogs Ltd. and all other affiliated companies, their officers, assigns and agents shall not disclose, directly or indirectly, in whole or in part, to any third person, firm or corporation, any Confidential Information which it received from DFM, unless given express written permission by DFM to disclose any such information.

3.  **Ownership of Information.** All Confidential Information shall be and remain the property of DFM.

4.   **Non Competition.** Lollytogs Ltd., their affiliated companies, their officers, assigns and agents hereby agree that they will not produce any of the above products that fall under the Industrial Work Apparel Market, Executive Apparel Market, Chef Apparel Market, Safety Apparel Market, Health Apparel Market and Uniforms for Men/Women Market (as detailed above) and enter into competition with DFM in the United States, Canada, North America, South America and the European Union using this Confidential Information for a period of two (2) years.

5.   **Termination.** Either party hereto may terminate this Agreement at any time by delivering a thirty day (30) written notice of termination to the other party by certified mail. Upon termination, Lollytogs Ltd. and all other affiliated companies, their officers, assigns and agents (if applicable) shall return to DFM all copies of the Confidential Information and all other materials furnished by DFM to Lollytogs and all other affiliated companies, their officers, assigns and agents (if applicable) in connection with the aforesaid investigation in the possession of its employees, agents or advisors or, if so instructed by DFM in writing, Lollytogs Ltd. and all other affiliated companies, their officers, assigns and agents shall destroy all such copies of data and materials furnished by DFM to Lollytogs and all other affiliated companies, their officers, assigns and agents. Notwithstanding such termination, the restrictions on disclosure and use of Confidential Information arising under this Agreement shall continue in force for two (2) years after the date of termination.

6.   **Amendment, Waiver.** This Agreement may not be amended or any provision hereof waived in whole or in part except by a writing signed by both parties hereto.

7.   **Governing Law.** This Agreement shall be governed by and construed in accordance with the Laws of the State of New Jersey.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed as of the date first above written.

By: _____        By: _____
Duty Free Manufacturers Ltd.        Lollytogs Ltd.
Victor Harary                       Joseph A. Sutton

Dated: 4/05/04                      Dated: 4/1/04

**EXHIBIT B**

# EMPLOYMENT AGREEMENT

This agreement is made the _28_ day of _september_, 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is 105 Hollywood Avenue, West Long Branch, New Jersey 07764-1836, ("Employee").

The parties hereto, in consideration of the premises and mutual agreements hereinafter set forth, agree, jointly and severally, as follows:

## Section I

### Nature of Employment

1.1  Employer does hire and employ Employee as a **Division President** and Employee does accept and agree to such hiring and employment. Subject to the supervision and pursuant to the orders, advice, and directions of Employer and its management, Employee shall perform the responsibilities listed herein, and shall perform such other duties as are customarily performed by one holding such position in other similar businesses or enterprises as that engaged in by Employer, and shall also additionally render such other and unrelated services and duties as may be reasonably assigned to Employee from time to time by Employer.

1.2  Responsibilities:

Employee acknowledges that Employee's primary responsibility is to

a.  Employee further agrees to use his best efforts to manage, generally, and obtain bona fide orders (domestic and international) for the purchase of merchandise from LollyTogs's new "Original Workwear"[1] industrial uniform division (the "Division") from all channels of distribution.

b.  Employee agrees to formulate sales strategy and establish prices, subject to the reasonable approval of Employer. Employee shall coordinate outside sales representatives and secure written terms with each, subject to the approval of LollyTogs.

c.  Employee shall work full time. Employee agrees to maintain typical business records at such location.

d.  Employee agrees to travel, both domestic and overseas (business class only for flights exceeding 7 hours or as otherwise allowed by Employer's travel policy) as is necessary to support the sales of the product line. Employee agrees to attend all relevant trade shows, as reasonably planned by Employer with Employee's due.

## Section II

### Manner of Performance of Employee's Duties

2.1  Employee agrees to perform, at all times faithfully, industriously, and to the best of his ability, experience, and talent, all of the duties that may be required of and from him pursuant to the express and implicit terms of this agreement, to the reasonable satisfaction of Employer.

## Section III

### Devotion by Employee of Full Time to Business

3.1  Employee shall devote all his time, attention, knowledge, and skill solely and exclusively to the business and interest of Employer, and Employer shall be entitled to all of the benefits, profits, or other issues arising from or incident to any and all work, services, and advice of Employee, and Employee expressly agrees that during the term of this agreement he will not be interested, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, Employee, or in any other form or capacity, in any other business similar to Employer's business or any allied trade.

---

[1] If "Better Workwear" becomes available, Harary will use best efforts to assign.

## Section IV
## Payment and Reimbursement for Full-Time Employment

4.1 So long as Employee is working full time for Employer, Employer shall pay Employee and Employee agrees to accept from Employer, in full payment for Employee's services under this agreement, compensation at the rate of $185,000.00 per annum, payable weekly ("Base Salary"). Employer will provide medical insurance for Employee and Employee's immediate family members under the guidelines of Employer's medical coverage policy ("Health Insurance Coverage"). This coverage will begin no sooner than _____ from the commencement of Employee's full-time employment.

4.2 In addition, Employer agrees that it will reimburse Employee for any and all necessary, customary, and usual expenses incurred by him while traveling for and on behalf of the Employer pursuant to Employer's directions. Employer may request proof of payment or a request for prior approval for all expenses as a condition to reimbursing Employee.

4.3 "Gross Profit Bonus": In addition to the compensation set forth above, Employee shall receive, as an annual bonus for each fiscal year beginning August 1, 2004 (i) 6% of the Employer's gross profit (as such term is defined by Generally Accepted Accounting Principals) resulting from sales that are taken by the Division and for its products and that are paid for by the customer. This shall be paid quarterly, but subject to an annual cumulative adjustment. The parties agree that the Gross Profit Bonus shall in no event be less than one percent (1%) of the Division's Net Sales. "Net Sales" shall exclude any and all costs associated with shipping, handling, insurance, sales taxes, allowances, discounts, refunds, adjustments, chargebacks, and/or similar fees, costs and expenses.

4.4 [Deleted.]

4.5 Further, after the first full fiscal year after the execution of this Agreement (or eighteen calendar months from such date, whichever is later), if sales (booked, shipped and paid) for the Division exceed ten million dollars ($10,000,000.00) during such fiscal year or eighteen (18) calendar months from such date, whichever is later, Employer shall pay Employee a one-time bonus of $100,000.00, payable within 30 days after such figures are certified by Employer's certified public accountants or chief financial officer, which shall not be unduly delayed.

## Section V
## Duration of Employment; Termination for Cause

5.1 The term of this agreement shall commence on the date set forth above and terminate at midnight on July 31, 2009. Sixty (60) days prior thereto, the parties hereto agree to negotiate a five (5) year renewal term, to be mutually agreed upon. If, for any reason (including termination for cause), this agreement is terminated or the employment of Employee is not renewed or extended after the initial five-year term, Employee shall receive a severance equal to the prior two (2) full year's Gross Profit Bonus, or the prior one (1) year's Base Pay, whichever is greater.

5.2 Employee agrees to execute Employer's standard Sexual Harassment Policy and Internet and Email Policy, and agrees to abide by any Employment Manual of either Employer or the Company.

5.3 Termination for Cause. Notwithstanding any provision of this Agreement to the contrary, the Employer may terminate Employee's employment by written notice of termination to Employee upon the following events:

a. The Division does not generate two million dollars ($2,000,000.00) in sales (booked, shipped and paid) (unless as a result of the Employer's inability to manufacture only) during any full fiscal year during which this Agreement is in effect, beginning August 1, 2005;

b. Employee's breach of any material obligation under the terms of his employment agreement with the Employer and failure to cure such breach within fourteen (14) days after written notice of breach from the Employer;

c. Employee's neglect or failure to carry out his duties as determined in the reasonable discretion of the directors or managers of the Employer and failure to cure such neglect or failure within fourteen (14) days

after written notice of breach from the Employer;

d.  Employee's voluntary resignation;

e.  Employee's being named in a lawsuit relating, directly or indirectly, to Steve Haber ("Haber") or DFM other than the pending litigation in the Superior Court of the State of New Jersey, Docket No. _____ or any successor suit thereto (the "Haber Suit");

f.  Employee's conviction of a felony or crime of moral turpitude; or

g.  Employee's commission of any act or omission to take any act which reasonably could be expected to have a material adverse effect on the business of the Employer or injures its reputation.

## Section VI
### Option To Terminate Contract for Permanent Disability of Employee:

6.1  Notwithstanding anything in this agreement to the contrary, Employer has the option to terminate this agreement in the event that during its term Employee shall become permanently disabled as the term permanently disabled is defined below. Such option shall be exercised by Employer giving notice to Employee by registered mail of its intention to terminate this agreement on the last day of the month during which such notice is mailed, and on the giving of such notice this agreement and the term of this agreement come to an end on the last day of the month in which the notice is mailed, with the same force and effect as if that day were originally set forth as the termination date of Employee's employment. For the purposes of this agreement, Employee shall be deemed to have become permanently disabled if, during any year of the term of this agreement, because of ill health, physical or mental disability, or for other causes beyond his control, he shall have been continuously unable or unwilling or have failed to perform his duties under this contract for 45 consecutive days, or if, during any year of the term of this agreement, he shall have been unable or unwilling or have failed to perform his duties for a total period of 90 days, either consecutive or not. For the purposes of this agreement, the term 'any year of the term of this agreement' is defined to mean any period of 12 calendar months commencing on the date of execution and each anniversary year thereafter. Employee shall receive long-term disability benefits in accordance with Employer's Senior Executive plan and agrees to comply with the terms and conditions of such plan.

## Section VII
### Discontinuance of Business or Division as Termination of Employment

7.1  Notwithstanding anything in this agreement to the contrary, in the event that Employer or its affiliates shall discontinue operating the Division, then this agreement will terminate as of the last day of the month in which Employer ceases such operations.  In such a case, severance compensation and bonuses will apply, and the non-complete applicable to the Division's business only shall not apply to Employee.  This paragraph shall survive termination of this Agreement.

## Section VIII

### [Omitted.]

## Section IX
### Nondisclosure of Information Concerning Business, Non-Competition and Non-Solicitation

9.1  Confidential Information. Employee acknowledges and agrees that Employee has and will come into contact with, have access to and learn various technical and non-technical trade secrets and other Confidential Information, which are the property of Employer. Such Confidential Information includes but is not limited to methods, procedures, devices and other means used by Employer in the conduct of its business, marketing plans and strategies, pricing plans and strategies, data processing programs, databases, including, but not limited to plans and strategies relating to the design, marketing and pricing of Employer's products, all of which Confidential Information is not publicly available; names and addresses of Employer's customers and their representatives responsible for entering into contracts for Employer's services, customer leads or referrals, specific customer needs and requirements and the manner in which they have been met by

Employer, information with respect to pricing, costs, profits, sales, markets, plans for future business and other development, all of which Confidential Information is not available from directories or other public sources; and information with respect to Employer's employees, their names and addresses, compensation, experience, qualifications, abilities, job performance and similar information. All of the Confidential Information has been developed, acquired or compiled by Employer at its great effort and expense.

9.2 <u>Non-Disclosure of Confidential Information</u>. Employee acknowledges and agrees that any disclosure, divulging, revealing or other use of any of the aforesaid Confidential Information by the Employee, other than in connection with LollyTogs's business will be highly detrimental to the business of LollyTogs and serious loss of business and pecuniary damage may result therefrom. Accordingly, Employee specifically covenants and agrees to hold all such Confidential Information and any documents containing or reflecting the same in the strictest confidence, and Employee will not, both during employment with LollyTogs or thereafter, without LollyTogs's prior written consent, disclose, divulge or reveal to any person whomsoever, or use for any purpose other than the exclusive benefit of LollyTogs, any Confidential Information whatsoever, whether contained in the Employee's memory or embodied in writing or other physical form.

9.3 <u>Non-Solicitation of Customers and Business Contacts.</u> Employee acknowledges and agrees that during the course and solely as a result of his relationship with LollyTogs, he has and will become aware of some, most or all of LollyTogs' customers and clients, their names and addresses, their representatives responsible for purchasing LollyTogs' goods and/or services, their specific needs and requirements, and leads and referrals to which LollyTogs has a business relationship (a "Business Contact"). Employee further acknowledges and agrees that the loss of such customers and clients or Business Contacts would cause LollyTogs great and irreparable harm. Consequently, Employee covenants and agrees that in the event of the termination of his relationship with LollyTogs, whether voluntarily or involuntarily, Employee will not, for a period of two (2) years following the date of termination, directly or indirectly solicit, for the purpose of selling or marketing similar goods and/or services to any customer, former customer or prospective customer of LollyTogs, or any Business Contact, with whom Employee came into contact while employed by LollyTogs. Employee shall not request or require any of the Business Contacts to cancel, reduce or otherwise modify any such business relationship.

9.4 <u>Non-Solicitation of Employees and Personnel</u>. Employee acknowledges and agrees that during the course of employment by LollyTogs, Employee has and may hereafter come into contact with some, most or all of LollyTogs's other employees or consultants, their knowledge, skills, abilities, salaries, commissions, benefits and other matters with respect to such employees not generally known to the public. Employee further acknowledges and agrees that any solicitation, luring away or hiring of such employees of LollyTogs will be highly detrimental to the business of LollyTogs and will cause LollyTogs serious loss of business and great and irreparable harm. Consequently, Employee covenants and agrees that during the course of employment by LollyTogs and for a period of three (3) years after termination of such employment (whether such termination is voluntary or involuntary), Employee shall not directly or indirectly, on behalf of Employee or another, solicit lure or hire any employees or consultants of LollyTogs of whom Employee became aware while employed by LollyTogs, or assist or aid in any such activity.

9.5 <u>Non-Competition.</u> Employee agrees that during the course of his employment with LollyTogs and for a period of two (2) years following the cessation of his employment with LollyTogs for any reason, he shall not, directly or indirectly, enter into or engage in the ownership, management, operation or control of, or act as an employee, advisor, consultant or contractor for any person, company or entity engaged in business similar to that of LollyTogs anywhere in the United States or Canada. This non-compete shall not apply to non-uniform apparel marketed to men and women.

9.6 <u>Conflict of Interest</u>. Employee may not use his position, influence, knowledge of Confidential Information or LollyTogs assets for personal gain. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, customer or prospective customer without disclosure and written approval from the President of LollyTogs, Ltd. is strictly prohibited and constitutes cause for dismissal and a claim for damages.

## Section X

## Commitments Binding on Employer Only on Written Consent

10.1    Anything contained in this agreement to the contrary notwithstanding, it is understood and agreed that Employee shall not have the right to make any contracts or commitments for or on behalf of Employer without the written consent (including email) of Employer.

## Section XI

## Contract Terms To Be Exclusive

11.1    This written agreement contains the sole and entire agreement between the parties and shall supersede any and all other agreements between the parties. The parties acknowledge and agree that neither of them has made any representation with respect to the subject matter of this agreement or any representations inducing its execution and delivery except such representations as are specifically set forth in this writing and the parties acknowledge that they have relied on their own judgment in entering into the same. The parties further acknowledge that any statements or representations that may have been made by either of them to the other are void and of no effect and that neither of them has relied on such statements or representations in connection with its dealings with the other.

## Section XII

## Waiver or Modification Ineffective Unless in Writing

12.1    It is agreed that no waiver or modification of this agreement or of any covenant, condition, or limitation contained in it shall be valid unless it is in writing and duly executed by the party to be charged with it, and that no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this agreement, or the rights or obligations of any party under it, unless such waiver or modification is in writing, duly executed as above. The parties agree that the provisions of this paragraph may not be waived except by a duly executed writing.

## Section XIII

## [Omitted]

## Section XIII

## Miscellaneous

14.1    Contract Governed by Law of State of New York.  The parties agree that it is their intention and covenant that this agreement and performance under it and all suits and special proceedings relating to it be construed in accordance with and under and pursuant to the laws of the State of New York and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this agreement, the laws of the State of New York shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

14.2    Severability. If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect.

14.3    Enforcement of Covenants. Employee acknowledges and agrees that compliance with this Agreement is necessary to protect the business and goodwill of LollyTogs and that any breach of this Agreement or any subparagraph hereof will result in irreparable and continuing harm to LollyTogs, for which money damages may not provide adequate relief. Accordingly, in the event of any breach or anticipatory breach of this Agreement by Employee, LollyTogs and Employee agree that LollyTogs shall be entitled to the following particular forms of relief as a result of such breach, in addition to any remedies otherwise available to it at law or equity: (a) injunctions, both preliminary and permanent, enjoining or restraining such breach or

anticipatory breach, and Employee hereby consents to the issuance thereof forthwith and without bond by any court of competent jurisdiction; and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by LollyTogs to enforce the provisions of this Agreement.

14.4 _Survivorship of Benefits._ This agreement shall inure to the benefit of the Employer's successors and assigns.

14.5 _Authority._ Employee warrants and represents that he has the authority to enter into this Agreement and that no other agreements, covenants, or representations affect in any way Employee's unfettered right to enter into this Agreement and to act in accordance herewith.

14.6 _Further Actions._ From time to time from after the date hereof, each party, at its expense and without further consideration, will execute and deliver such documents to the other party as the other party may reasonably request in order to more effectively consummate the transaction contemplated herein.

IN WITNESS WHEREOF, the undersigned have executed this Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By _____
Richard Sutton

**Employee:**

VICTOR HARARY

**EXHIBIT C**

This letter agreement is made the _28_ day of _September_, 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is _____, _____, ("Employee"), and is made in conjunction with that certain Employment Agreement of the same date.

Re:    LollyTogs and Victor Harary Employment Agreement
        Side Letter: Business of Duty Free Manufacturers, Ltd.; Intellectual Property; Indemnity

1. The parties agree that as a condition to the Employment Agreement and the employment contemplated therein:

    a. The business heretofore owned by Employee, Duty Free Manufacturers, Ltd. of Red Bank, New Jersey ("DFM"), be dissolved and all agreements between it and Employer to this date which may obligate Employer in any way be terminated and released, such dissolution to be effective no later than thirty (30) days from the date set forth above, or promptly upon a judgment or settlement of the Haber Suit (as such term is defined in the Agreement).

    b. All intellectual property of Employee and DFM, including their trademarks, copyrights and designs set forth on the attached Exhibit A, be assigned to the Employer.

    c. All third party salesperson contracts involving DFM be disclosed to Employer for evaluation and assumption. Annexed hereto as Exhibit B is a list of all such agreements.

2. Employee represents and warrants that he is a shareholder of DFM and has authority to enter into the Agreement and to make the representations contained herein.

IN WITNESS WHEREOF, the undersigned have executed this Letter Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By _____
    Richard Sutton    _or. (J.S.)_

**Employee:**

VICTOR HARARY

7

**EXHIBIT D**

**LOLLYTOGS**
FRENCH TOAST LTD.

SHOWROOM & BUYING OFFICE •
New York, NY 10001-2900 • 100 W. 33rd St., Suite 1012
www.frenchtoast.com • Tel: 212.502.6000 • Fax: 212.594.303(

## SEPARATION AGREEMENT

AGREEMENT made this 15th day of June, 2007 (hereinafter referred to as the "Agreement"), by and between Victor Harary (hereinafter referred to as "Harary"), and Lollytogs, Ltd. (hereinafter referred to as "Lollytogs" or the "Company").

### W I T N E S S E T H :

WHEREAS, Harary has been employed by of the Company; and

WHEREAS, the Company and Harary now desire to end the employment relationship and the parties wish to resolve amicably all outstanding issues, rights and obligations by and between them and to embody those understandings in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the representations, promises and obligations herein contained, the parties hereto agree as follows:

1. The parties agree that Harary's employment with the Company will terminate on June 30, 2007 (the "Termination Date"). The Company agrees to continue to pay Harary an amount equal to his salary at the current rate, on the Company's regular pay days, for a period of twelve months following the Termination Date. The Company will also pay Harary for any accrued but unused paid time off to which Harary is entitled as of the Termination Date. The parties also agree that the employment agreement, dated September 28, 2004, between Harary and the Company, is no longer of any force and effect, except that sections 9.1, 9.2, 9.3 and 9.4 shall survive the termination of the employment agreement.

31344918 1

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  B E T T E R  L O O K I N G  W O R L D



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

2.      Harary understands that, as of the Termination Date, he will no longer be an employee of the Company, and that he will no longer be entitled to participate in any employee benefit or incentive plan maintained by the Company, including any medical, life or other insurance plan (except as allowed under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") with respect to continuation medical coverage). Notwithstanding the foregoing, the Company agrees that, to the extent that Harary elects continuation coverage under COBRA, the Company will pay on behalf of Harary the cost of the premiums for medical insurance for the six-month period following the Termination Date.

3.      Harary represents that as of the Termination Date, he will have returned all property of the Company, including but not limited to, any computers, telephones, documents, books, records (whether in electronic format or hard copy), reports, files, correspondence, notebooks, manuals, notes, specifications, mailing lists, credit cards and data in his possession or control.

4.      Harary, for himself and for the executors and administrators of his estate, his heirs, successors and assigns, hereby releases and forever discharges the Company and its officers, directors, employees and stockholders and the respective executors, administrators, heirs, successors and assigns of the foregoing, from any and all claims, actions, causes of action, suits, sums of money, debts, dues, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, demands or damages of any

31344918.1

2

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

nature whatsoever or by reason of any matter, cause or thing regardless of whether known or unknown at present, which against the Company or any of its officers, directors, employees or stockholders Harary ever had, now has or hereafter can, shall or may have for, upon, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to the date hereof including, but not limited to, any matter relating to or arising out of the employment of Harary or termination thereof under any contract, tort, federal, state or local fair employment practices or civil rights law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the federal Family and Medical Leave Act, the New York State Human Rights Law, the New York City Human Rights Law, the New Jersey Law Against Discrimination, or any claim for physical or emotional distress or injuries, or any other duty or obligation of any kind or description, including any implied covenant of good faith and fair dealing, implied contract of permanent employment or the tortious or willful discharge of employment.  The parties also agree that this Agreement does not either affect the rights and responsibilities of the Equal Employment Opportunity Commission to enforce the Age Discrimination in Employment Act, or justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission under the Age Discrimination in Employment Act.  In the event the Equal Employment Opportunity

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  B E T T E R  L O O K I N G  W O R L D



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

Commission commences a proceeding against the Company in which Harary is a named party, Harary agrees to waive and forego any monetary claims which may be alleged by the Equal Employment Opportunity Commission to be owed to Harary. The parties also agree that nothing in the provisions of this paragraph 4 is intended to limit their rights under and concerning enforcement of this Agreement.

5.    Harary represents that he is unaware of any facts that could form the basis of a claim either (i) by the Company against him, or (ii) by a third party against the Company. Based upon such representation, the Company releases and forever discharges Harary, his executors and administrators of his estate, and his heirs, successors and assigns, from any and all claims, actions, causes of action, suits, sums of money, debts, dues, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, demands or damages of any nature whatsoever or by reason of any matter, cause or thing regardless of whether known or unknown at present, which against Harary, his executors and administrators of his estate, and his heirs, successors and assigns, which the Company ever had, now has or hereafter can, shall or may have for, upon, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to the date hereof.

6.    Harary agrees to keep confidential the terms of this Agreement and not to disclose any term of this Agreement to any other person or entity, except for Harary's family, accountants and attorneys. In the event that Harary is required by law to disclose any

31344918.1

4

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

term of this Agreement, Harary agrees to give the Company ten days' written notice prior to any such disclosure, or such shorter time period as mandated by law or is otherwise practicable.

7.    Harary shall not make any statements, either directly or through other persons or entities, which are disparaging to the Company or any of its affiliates, management, officers, directors, services, products, operations, prospects or other matters relating to the Company's businesses. The Company, through its officers and directors, shall not make any statements, either directly or through other persons or entities, which are disparaging to Harary.

8.    The Company has advised Harary to consult with an attorney prior to executing this Agreement. By executing this Agreement, Harary acknowledges that (a) he has been provided an opportunity to consult with an attorney or other advisor of his choice regarding the terms of this Agreement, (b) this is a final offer and Harary has been given twenty-one (21) days in which to consider whether he wishes to enter into this Agreement, (c) Harary has elected to enter this Agreement knowingly and voluntarily and (d) if he does so within fewer than twenty-one (21) days from receipt of the final document he has knowingly and voluntarily waived the remaining time. The Company reserves the right to change or revoke this Agreement prior to Harary's execution hereof. This Agreement shall be fully effective and binding upon all parties hereto immediately upon execution of this Agreement

31344918.1

5

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD

**LOLLYTOGS**
FRENCH TOAST  LTD.

SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

except as to rights or claims arising under the ADEA, in which case Harary has seven (7) days following execution of this Agreement to change his mind (the "Revocation Period").

9.    Any notice to be given hereunder shall be in writing and shall be deemed given when mailed by certified mail, return receipt requested, addressed as follows:

To Harary at:      Victor. Harary
                   105 Hollywood Avenue
                   West Long Branch, NJ 07764-1836

With a copy to:

To the Company at:  Lollytogs, Ltd.
                    100 West 33rd Street
                    Suite 1012
                    New York, New York  10001

                    Attention:  C.E.O.

With a copy to:     Sheldon Nussbaum, Esq.
                    Fulbright & Jaworski L.L.P.
                    666 Fifth Avenue, 31st Floor
                    New York, New York  10103

or at such other address as may be indicated in writing by any party to the other parties in the manner provided herein for giving notice.

10.    In the event that any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.  This Agreement will survive the termination of any arrangements contained herein and is binding on and will

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD

**LOLLYTOGS**
FRENCH TOAST LTD.

SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303(

inure to the benefit of each of the parties and their respective affiliates, heirs, executors, administrators, successors and assigns.

11.    This Agreement shall be governed by the substantive laws of the State of New York, without giving effect to any principles of conflicts of law.

12.    Each of the parties agrees to do and perform or cause to be done and performed all further acts and shall execute and deliver all other documents necessary on its part to carry out the intent and accomplish the purposes of this Agreement and the transaction contemplated hereby.

13.    This Agreement sets forth the entire agreement between the parties hereto concerning the subject matter hereof and may not be changed without the written consent of each of the parties.

IN WITNESS WHEREOF, the parties have each executed this Agreement as of the date first written above.

Lollytogs, Ltd.

By: _____
Name: Richard Sutton
Title:  C.E.O.


_____
Victor Harary

31344918.1                               7

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD

EXHIBIT E





**Apparel Collections:**    WorkWear    Security    Corporate    Health

**Products:**

Work Shirts

Pants

Coveralls

Knit Shirts

**Search:** by Style #

**Advanced Search**

**My Account:**

> Home > About OWW > Global Compliance

# Global Compliance

## Code of Conduct

At Official Workwear, we are committed to:

- a standard of excellence in every aspect of our business and in every corner of the world;
- ethical and responsible conduct in all of our operations;
- respect for the rights of all individuals.

**We expect these same commitments to be shared by all manufacturers of Official Workwear' m In the selection of our suppliers, Official Workwear works hard to choose reputable business pa are committed to ethical standards and business practices compatible with those of Official Wo**

This Code of Conduct applies to factories that produce goods for Official Workwear, or any of its subsidiari or agents ("Official Workwear' Suppliers").

While Official Workwear recognizes that there are different legal and cultural environments in which factori throughout the world, this Code of Conduct sets forth the basic minimum requirements all factories must r

**About OWW**    **Policies**    **Terms Of Use**    **Size Chart**    **Features**    **Contact Us**

EXHIBIT F

  

**Apparel Collections:** WorkWear    Security    Corporate    Health

> Home > About OWW > Corporate Profile

**Products:**
Work Shirts
Pants
Coveralls
Knit Shirts

**Search:** by Style #

**Advanced Search**

**My Account:**

# Corporate Profile

Official Workwear is a global manufacturer with company-dedicated manufacturing partners and international mills. A strict level of quality control is maintained through quality assurance teams in overseas offices, as well as a global quality assurance manager who helps ensure that we exceed expectations.

## Official Workwear Executives

Victor Harary- President, with over 30 years of design, sourcing, manufacturing, and distribution experience apparel market channel, servicing clients like Target, the Gap, and JC Penney.

Steve Pigott- Western Regional Vice President of Sales, brings 22 years of sale experience in the Indu market with Angelica Image Apparel as Vice President of sales for the Western States region.

## Channel of Distribution

Textile Rental Laundries & Uniform/Corporate Apparel re-sellers and retailers.

**About OWW    Policies    Terms Of Use    Size Chart    Features    Contact Us**

**EXHIBIT G**

  

**Apparel Collections:** WorkWear     Security     Corporate     Health

**Products:**

> Home > Security

**Search:** by Style #

**Advanced Search**

**My Account:**



**Thank you** for visiting Officialworkv

We are currently developing product
our collections to include security, c
health apparel. These selections will
for viewing and purchasing soon.

Please visit us again as new items w
to the online catalog.

**About OWW**     **Policies**     **Terms Of Use**     **Size Chart**     **Features**     **Contact Us**

<u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK     )
                         ) ss.:

COUNTY OF NEW YORK   )

_Warren Williams_ , being duly sworn, deposes and says:

I am not a party to the action, am over 18 years of age, and reside at New York City, New York.

On November 2, 2007, I served the annexed AFFIDAVITS IN OPPOSITION AND EXHIBITS by personally delivering a true copy thereof to the offices of the following addressee at the address designated by it as its offices, as follows:

         JACKSON LEWIS LLP
         59 Maiden Lane
         New York, New York 10038

_Warren Williams_  1202

Sworn to before me this
2nd day of November, 2007

_Estelle Ginsberg_
Notary Public

Estelle Ginsberg
Notary Public, State of New York
No. 01GI4726346
Qualified in Queens County
Commission Exp. Nov. 30, 2006

2010