UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICTOR HARARY,<br><br>                 Plaintiff,<br><br>      -against-<br><br>LOLLY TOGS LTD., RICHARD SUTTON and ALFRED SUTTON,<br><br>                Defendants. | Civil Action No. 07 CIV 7878 (RPP) (KNF)<br><br><br>**REPLY AFFIDAVIT OF JOSEPH SUTTON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

STATE OF NEW YORK      )
                             ) ss.:
COUNTY OF NEW YORK   )

**JOSEPH SUTTON**, being duly sworn, deposes and says:

1.     I am, and at all relevant times herein have been, Executive Vice President at Lollytogs, Ltd. ("Lollytogs"), a defendant in this action. I submit this Reply Affidavit in further support of Defendants Lollytogs, Richard Sutton and Alfred Sutton's ("Defendants") Motion to Dismiss Plaintiff's Complaint against Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6).

A.    **Background**

2.     Lollytogs is a closely-held, children's clothing business that was started in 1958. The company produces complete lines of clothing for boys and girls, including active wear, denim, holiday wear, outer wear, play wear, school uniforms, sports wear and swim wear and sells these lines to department stores, discount stores, and independent stores, among others. Prior to the OWW Division, Lollytogs had not sought to source or manufacture industrial uniforms.

3.    In or about early 2004, I was introduced to Plaintiff Victor Harary ("Plaintiff" or "Mr. Harary") through a mutual acquaintance.

4.    Mr. Harary claimed to have had extensive experience in overseas sourcing and sales of garments in the United States as well as knowledge about the industrial uniform industry.  When we met in 2004, Mr. Harary represented to me that he had previously been an agent for large retailers, including Gap and Target, and had also owned his own garment company that sourced and sold millions of dollars of garments on an annual basis.

5.    Plaintiff initially approached me and inquired as to whether Lollytogs would be able to assist in the sourcing and manufacture of industrial uniforms overseas to be sold in the United States to industrial laundries, among other potential customers.

6.    Mr. Harary represented to Lollytogs at this time that he had industrial laundries and other customers willing to purchase the uniforms, but required assistance in sourcing and manufacturing the uniforms.

7.    Contrary to the statements made in his affidavit, Mr. Harary represented that Duty Free Manufacturing would provide financing to Lollytogs so that it could then provide financing to the overseas factories that would be manufacturing the uniforms to ensure that the factories would be paid for the manufacturing undertaken by them.

8.    In reliance upon these representations, Lollytogs identified overseas factories to manufacture the uniforms requested by Mr. Harary.

9.    Notwithstanding his repeated statements to Lollytogs that the financing was forthcoming, Mr. Harary was never able to provide the financing that he had promised to Lollytogs.

10.    As a result of these representations that financing would be furnished, Lollytogs made commitments to overseas mills and factories to manufacture industrial uniforms.

11.    While Mr. Harary never fulfilled his promises to provide the financing, Lollytogs felt obligated to honor its commitments to the mills and factories to preserve its reputation and good standing in the marketplace developed over the course of nearly 50 years in business.

**B.    The September 2004 Employment Agreement between Lollytogs and Mr. Harary**

12.    Against this background of Lollytogs committing to these overseas mills and factories and Mr. Harary's failure to provide the promised financing, the parties entered into the September 2004 Employment Agreement and Mr. Harary stopped operating his company, Duty Free Manufacturing, Ltd. ("Duty Free Manufacturing").

13.    Mr. Harary and I subsequently discussed and negotiated the dissolution of Duty Free Manufacturing and his potential employment with Lollytogs as President of a new, industrial uniform division within Lollytogs to be called Official Work Wear ("OWW Division"). These discussions were prompted, at least in part, by the previous commitments that Lollytogs had with the overseas mills and factories to manufacture industrial uniforms.

14.    The discussions and negotiations culminated in the September 2004 Employment Agreement and Side Letter of the same date dissolving Duty Free Manufacturing, which are attached to this affidavit as Exhibits "A" and "B," respectively.

15.    Plaintiff's suggestion in his affidavit that he received no benefit or consideration from Lollytogs in connection with dissolving Duty Free Manufacturing, other than the Employment Agreement, is plainly wrong. Lollytogs negotiated a settlement between Mr. Harary and his former partner.

3

16.    Moreover, Mr. Harary did not contribute any money in connection with starting or setting up the OWW Division.

17.    Significantly, Plaintiff's affidavit submitted in opposition to Defendants' motion omits any reference to Mr. Harary's negotiation of the terms of the September 2004 Employment Agreement both directly with Lollytogs and through his counsel, Mr. Hauser, the same lawyer representing him in this lawsuit.  There were multiple drafts of the employment agreement exchanged between Lollytogs and Mr. Harary representing comments and revisions made, not only by Lollytogs, but also by Mr. Harary and his attorney.

18.    The September 2004 Employment Agreement contains many terms that are very favorable and advantageous to Mr. Harary.  For instance, there is a relatively narrow Termination for Cause provision in Section 5.1 of the agreement that Plaintiff negotiated for and a severance provision in Section 7.1 that provides for severance to be paid *even if Mr. Harary is terminated by Lollytogs for cause*, which provision was also negotiated by Plaintiff.

19.    In light of the precarious financial situation of Duty Free Manufacturing and its inability to secure the promised financing, Lollytogs's employment of Mr. Harary presented it with significant business risk that the start-up, OWW Division might incur financial losses and might need to be discontinued if the division was not financially viable.  The parties clearly envisioned this possibility.  On its face, the September 2004 Employment Agreement clearly is not "non-cancelable," as stated in Mr. Harary's affidavit.

20.    The parties expressly provided by contract for a possible dissolution of the division.  Mr. Harary, with the representation of counsel, agreed to Section 7.1 of the September 2004 Employment Agreement, entitled "Discontinuance of Business or Division as Termination of Employment".  (Exhibit A, § 7.1.)

4

21.     Section 7.1 of the Employment Agreement states that:

> Notwithstanding anything in this agreement to the contrary, *in the event that Employer or its affiliates shall discontinue operating the Division*, then this agreement will terminate as of the last day of the month in which Employer ceases such operations. In such a case, severance compensation and bonuses will apply, and the non-compete applicable to the Division's business only shall not apply to Employee. This paragraph shall survive termination of this Agreement.

(Exhibit A, §7.1; emphasis added.)

22.     Section 5.1 of the Employment Agreement, which addresses termination of the agreement, states, in pertinent part, that "*[i]f, for any reason (including termination for cause), this agreement is terminated . . . Employee shall receive a severance equal to the prior two (2) year's Gross Profit Bonus, or the prior one (1) year's Base Pay, whichever is greater.*" (Exhibit A, §5.1; emphasis added.)

23.     The severance concept embodied in Section 5.1, if the employment agreement was terminated during the initial term or not renewed thereafter, was included at Mr. Harary's request and Lollytogs acceded to this demand. Plaintiff demanded a severance provision, even if the agreement was terminated *for cause.*

24.     The September 2004 Employment Agreement provides that it will be governed by New York law, and further states it is "the sole and exclusive agreement between the parties and shall supersede any and all other agreements between the parties". (Exhibit A, §§ 14.1 and 11.1.)

**C.     June 15, 2007 Discontinuation of the OWW Division of Lollytogs, Ltd.**

25.    Over time, it became clear that Mr. Harary did not have the level of sales, merchandising and customer contacts in the industrial uniform industry that he represented to Lollytogs during his negotiations with the company in 2004.

26.    Mr. Harary meritlessly suggests that Lollytogs, including the individual defendants, Richard and Alfred Sutton, among others, interfered with his ability to perform under the September 2004 Employment Agreement through use of the Lollytogs's central buying office to assist with the production of garments.

27.    Mr. Harary's September 2004 Employment Agreement with Lollytogs explicitly states that his activities as Division President of the OWW Division are "[s]ubject to the supervision and pursuant to the orders, advice and directions of Employer and its management . . . ." (Exhibit A, ¶1.1.) Mr. Harary's primarily responsibilities were to obtain purchase orders, formulate sales strategies and support the sales of the OWW Division's product lines. (Exhibit A, ¶1.1)

28.    Critically, there is nothing in the September 2004 Employment Agreement with Mr. Harary that provides him with any contractual rights to be the sole, or even primary, decision-maker to determine where product is manufactured or requiring treatment of the OWW Division any differently than every other division of Lollytogs, which may make use of Lollytogs's central buying office and the mills and factories with which Lollytogs has worked in the past. Further, Lollytogs, Alfred Sutton and Richard Sutton do not own any mills overseas, as mistakenly claimed in Plaintiff's opposition papers.

29.    The suggestion that Lollytogs would steer production jobs to mills and factories that would overcharge the OWW Division is nonsensical. Lollytogs invested a great

deal of time and money into the division and had a great economic interest in its profitability and success and no reason to see it fail.

30.     Similarly, Mr. Harary was never advised by Lollytogs not to compete with Red Kap, the largest uniform supplier in the United States.  Rather, Plaintiff was asked not to disparage Red Kap in making his sales.  Moreover, as a practical matter, it is inconceivable for the OWW Division to do business and not compete with the largest uniform supplier and market share leader.

31.     After significant, mounting losses for nearly three years with relatively few sales of uniforms made by Mr. Harary or the OWW Division, Lollytogs made the business decision that it could no longer continue to generate staggering losses which at that point totaled millions of dollars.  This is without even taking into account millions of dollars more in inventory write-downs, some of which have already occurred.  The OWW Division's losses were a major drain on the company, its profitability and cash flow, and continue to adversely impact the company's financial performance.

32.     Accordingly, on June 15, 2007, Lollytogs discontinued the OWW Division.  As indicated by e-mail from Richard Sutton, Lollytogs's Chief Executive Officer, to Lollytogs's personnel, limited OWW staff would remain employed for a period of time to assist with the liquidation of remaining inventory and to communicate with customers "to ensure a flawless exit".  (See June 18, 2007 e-mail from Richard Sutton announcing the June 15, 2007 discontinuance of the OWW Division, attached hereto as Exhibit "C".)

33.     Consistent with the September 2004 Employment Agreement, Lollytogs continued to employ Mr. Harary and pay him his base salary through June 30, 2007.  His employment agreement with Lollytogs was terminated as of that date.  (Exhibit A, §7.1.)

34.     Notwithstanding the devastating financial losses that the OWW Division suffered, Lollytogs honored its full contractual obligations to Mr. Harary by offering him the severance pay of one year's salary of $185,000, payable weekly, in accordance with Section 7.1 of the Employment Agreement for discontinuance of the division.  This is higher than two year's of bonus payments, as alternatively provided for under that section.  Mr. Harary acknowledges that Lollytogs was willing to pay him the severance in his affidavit.  (See Separation Agreement attached hereto as Exhibit "D".)

35.     In addition, although Lollytogs had no contractual obligation under the employment agreement to do so, it offered to pay the premiums associated with Mr. Harary's medical coverage if he elected COBRA continuation coverage.  (Exhibit D, ¶2.)

36.     Lollytogs advised Mr. Harary that post-termination, it expected him to abide by his non-disclosure of confidential information and non-solicitation of customers, business contacts and employees covenants (set forth in Sections 9.1, 9.2, 9.3 and 9.4 of the September 2004 Employment Agreement).   However, since the OWW Division was discontinued, contrary to the statements made in Mr. Harary's affidavit, Lollytogs was not seeking to enforce against Plaintiff the non-competition obligations of the employment agreement in Section 9.5.  (Exhibit D, ¶1; see also Exhibit A, §7.1.)

37.     Plaintiff's affidavit and the affidavit of Jeffrey Smith, a former OWW Division salesperson, in opposition to this motion, leap to the wild and unsupported conclusion that the OWW Division has not been discontinued because its website was not taken down until recently and based on statements allegedly made by me at a sales meeting before the division was discontinued.

38.    The OWW Division website (www.officialworkwear.com) is now inoperable, except for a single page advising visitors to contact Lollytogs to purchase existing inventory Lollytogs is trying to liquidate.  (See web page from www.officialworkwear dated November 12, 2007 attached hereto as Exhibit "E".)

39.    The operation of the OWW Division has been a complete failure. Lollytogs is warehousing approximately $5,000,000 in inventory that constitutes a tremendous cash flow strain on its business and will continue to do so until liquidated.

40.    The affidavits of Messrs. Harary and Smith erroneously assert that the division is continuing.  Lollytogs is simply seeking to liquidate its existing industrial uniform inventory.  The company has not issued a single purchase order to produce any industrial uniforms or other products formerly offered by the OWW Division since June 15, 2007.

41.    The affidavit of Mr. Smith also refers to a sales meeting of the OWW Division in Las Vegas on June 3, 2007 before the OWW Division was discontinued.  At that meeting, I encouraged the OWW sales force, including Mr. Smith, to sell the OWW Division's existing inventory and stated that salespeople could earn up to $500,000.  My comments were addressed to selling the inventory in stock and/or pre-selling high margin orders, since the OWW Division was suffering large financial losses, the existing inventory was interfering with cash flow and preventing the company from buying new goods, and selling that inventory became a high priority.

42.    As Mr. Smith admits, nearly two weeks after I attended that meeting in Las Vegas led by Mr. Harary, I called Mr. Smith (as I did with other OWW Division salespeople) to advise that the OWW Division was discontinued effective June 15, 2007.

43.    Finally, Mr. Smith's affidavit mischaracterizes the division's interactions with an industry laundry company, Prudential Company. While the OWW Division was meeting in Las Vegas, it requested, through Mr. Smith, information from Prudential Company on its annual uniform purchases, including pricing information, and was advised that its total uniform purchases are approximately $21,000,000. There was absolutely no discussion with Prudential Company about it shifting its "entire" business to the OWW Division, a start-up company.

44.    The OWW Division never received a single purchase order from Prudential Company at any time from its inception in September 2004 until the division was discontinued in June 2007, and certainly never received a written commitment for $21,000,000.

45.    The OWW Division is not now accepting, and has not accepted at any time since June 15, 2007, any pre-booked orders from Prudential Company, Mission Linen or any other customer or potential customer. Indeed, the OWW Division was contacted by a prospective customer for a modest pre-book order, which was declined by Lollytogs given that its OWW Division has been discontinued. As set forth above, the OWW Division website has been removed, except for a single page advising of liquidation inventory at 50% off previously listed prices.

46.    Mr. Smith is not employed by the OWW Division or otherwise at Lollytogs. As stated above, Lollytogs has not accepted (and will not accept) pre-booked orders from Mr. Smith or anyone else for uniforms previously offered by the OWW Division. This division has lost millions upon millions of dollars, has been discontinued and is no longer a part of Lollytogs's business.

47.    Glaringly missing from the Harary and Smith affidavits is the identification of even a single pre-book order -- an order for sale of goods to be manufactured in the future -- accepted by the OWW Division after June 15, 2007 because there are no such purchase orders.

48.    OWW has tendered back to its New Jersey landlord the leased space previously occupied by the OWW Division, and no one has been on premises in that space since June 15, 2007, the date that the division was discontinued.

49.    At one time, the OWW Division had approximately 12 employees, including salespeople.    Today, only two individuals remain whose sole job is to attempt to liquidate the existing inventory.

50.    For all of the foregoing reasons, and for the reasons set forth in Defendants' original moving papers, Defendants' motion to dismiss should be granted in its entirety with prejudice.

JOSEPH SUTTON

**SWORN TO BEFORE ME THIS**
____ day of November 2007

NOTARY PUBLIC
Jeffrey S. Dweck
Notary Public, State of New York
Reg. No. 02DW5072837
Qualified in Kings County
Commission Expires Feb. 10, 2011

11

# EXHIBIT "A"

# EMPLOYMENT AGREEMENT

This agreement is made the $28$ day of September, 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is 105 Hollywood Avenue, West Long Branch, New Jersey 07764-1836, ("Employee").

The parties hereto, in consideration of the premises and mutual agreements hereinafter set forth, agree, jointly and severally, as follows:

## Section I

### Nature of Employment

1.1 Employer does hire and employ Employee as a **Division President** and Employee does accept and agree to such hiring and employment. Subject to the supervision and pursuant to the orders, advice, and directions of Employer and its management, Employee shall perform the responsibilities listed herein, and shall perform such other duties as are customarily performed by one holding such position in other similar businesses or enterprises as that engaged in by Employer, and shall also additionally render such other and unrelated services and duties as may be reasonably assigned to Employee from time to time by Employer.

1.2 Responsibilities:

Employee acknowledges that Employee's primary responsibility is to

a. Employee further agrees to use his best efforts to manage, generally, and obtain bona fide orders (domestic and international) for the purchase of merchandise from LollyTogs's new "Original Workwear"[1] industrial uniform division (the "Division") from all channels of distribution.

b. Employee agrees to formulate sales strategy and establish prices, subject to the reasonable approval of Employer. Employee shall coordinate outside sales representatives and secure written terms with each, subject to the approval of LollyTogs.

c. Employee shall work full time. Employee agrees to maintain typical business records at such location.

d. Employee agrees to travel, both domestic and overseas (business class only for flights exceeding 7 hours or as otherwise allowed by Employer's travel policy) as is necessary to support the sales of the product line. Employee agrees to attend all relevant trade shows, as reasonably planned by Employer with Employee's due.

## Section II

### Manner of Performance of Employee's Duties

2.1 Employee agrees to perform, at all times faithfully, industriously, and to the best of his ability, experience, and talent, all of the duties that may be required of and from him pursuant to the express and implicit terms of this agreement, to the reasonable satisfaction of Employer.

## Section III

### Devotion by Employee of Full Time to Business

3.1 Employee shall devote all his time, attention, knowledge, and skill solely and exclusively to the business and interest of Employer, and Employer shall be entitled to all of the benefits, profits, or other issues arising from or incident to any and all work, services, and advice of Employee, and Employee expressly agrees that during the term of this agreement he will not be interested, directly or indirectly, in any form, fashion, or manner, as partner, officer, director, stockholder, advisor, Employee, or in any other form or capacity, in any other business similar to Employer's business or any allied trade.

---

[1] If "Better Workwear" becomes available, Harary will use best efforts to assign.

## Section IV

### Payment and Reimbursement for Full-Time Employment

4.1 So long as Employee is working full time for Employer, Employer shall pay Employee and Employee agrees to accept from Employer, in full payment for Employee's services under this agreement, compensation at the rate of $185,000.00 per annum, payable weekly ("Base Salary"). Employer will provide medical insurance for Employee and Employee's immediate family members under the guidelines of Employer's medical coverage policy ("Health Insurance Coverage"). This coverage will begin no sooner than _____ from the commencement of Employee's full-time employment.

4.2 In addition, Employer agrees that it will reimburse Employee for any and all necessary, customary, and usual expenses incurred by him while traveling for and on behalf of the Employer pursuant to Employer's directions. Employer may request proof of payment or a request for prior approval for all expenses as a condition to reimbursing Employee.

4.3 "Gross Profit Bonus": In addition to the compensation set forth above, Employee shall receive, as an annual bonus for each fiscal year beginning August 1, 2004 (i) 6% of the Employer's gross profit (as such term is defined by Generally Accepted Accounting Principals) resulting from sales that are taken by the Division and for its products and that are paid for by the customer. This shall be paid quarterly, but subject to an annual cumulative adjustment. The parties agree that the Gross Profit Bonus shall in no event be less than one percent (1%) of the Division's Net Sales. "Net Sales" shall exclude any and all costs associated with shipping, handling, insurance, sales taxes, allowances, discounts, refunds, adjustments, chargebacks, and/or similar fees, costs and expenses.

4.4 [Deleted.]

4.5 Further, after the first full fiscal year after the execution of this Agreement (or eighteen calendar months from such date, whichever is later), if sales (booked, shipped and paid) for the Division exceed ten million dollars ($10,000,000.00) during such fiscal year or eighteen (18) calendar months from such date, whichever is later, Employer shall pay Employee a one-time bonus of $100,000.00, payable within 30 days after such figures are certified by Employer's certified public accountants or chief financial officer, which shall not be unduly delayed.

## Section V

### Duration of Employment; Termination for Cause

5.1 The term of this agreement shall commence on the date set forth above and terminate at midnight on July 31, 2009. Sixty (60) days prior thereto, the parties hereto agree to negotiate a five (5) year renewal term, to be mutually agreed upon. If, for any reason (including termination for cause), this agreement is terminated or the employment of Employee is not renewed or extended after the initial five-year term, Employee shall receive a severance equal to the prior two (2) full year's Gross Profit Bonus, or the prior one (1) year's Base Pay, whichever is greater.

5.2 Employee agrees to execute Employer's standard Sexual Harassment Policy and Internet and Email Policy, and agrees to abide by any Employment Manual of either Employer or the Company.

5.3 Termination for Cause. Notwithstanding any provision of this Agreement to the contrary, the Employer may terminate Employee's employment by written notice of termination to Employee upon the following events:

   a. The Division does not generate two million dollars ($2,000,000.00) in sales (booked, shipped and paid) (unless as a result of the Employer's inability to manufacture only) during any full fiscal year during which this Agreement is in effect, beginning August 1, 2005;

   b. Employee's breach of any material obligation under the terms of his employment agreement with the Employer and failure to cure such breach within fourteen (14) days after written notice of breach from the Employer;

   c. Employee's neglect or failure to carry out his duties as determined in the reasonable discretion of the directors or managers of the Employer and failure to cure such neglect or failure within fourteen (14) days

after written notice of breach from the Employer;

    d.   Employee's voluntary resignation;

    e.   Employee's being named in a lawsuit relating, directly or indirectly, to Steve Haber ("Haber") or DFM other than the pending litigation in the Superior Court of the State of New Jersey, Docket No. _____ or any successor suit thereto (the "Haber Suit");

    f.   Employee's conviction of a felony or crime of moral turpitude; or

    g.   Employee's commission of any act or omission to take any act which reasonably could be expected to have a material adverse effect on the business of the Employer or injures its reputation.

## Section VI

### Option To Terminate Contract for Permanent Disability of Employee:

6.1  Notwithstanding anything in this agreement to the contrary, Employer has the option to terminate this agreement in the event that during its term Employee shall become permanently disabled as the term permanently disabled is defined below. Such option shall be exercised by Employer giving notice to Employee by registered mail of its intention to terminate this agreement on the last day of the month during which such notice is mailed, and on the giving of such notice this agreement and the term of this agreement come to an end on the last day of the month in which the notice is mailed, with the same force and effect as if that day were originally set forth as the termination date of Employee's employment. For the purposes of this agreement, Employee shall be deemed to have become permanently disabled if, during any year of the term of this agreement, because of ill health, physical or mental disability, or for other causes beyond his control, he shall have been continuously unable or unwilling or have failed to perform his duties under this contract for 45 consecutive days, or if, during any year of the term of this agreement, he shall have been unable or unwilling or have failed to perform his duties for a total period of 90 days, either consecutive or not. For the purposes of this agreement, the term 'any year of the term of this agreement' is defined to mean any period of 12 calendar months commencing on the date of execution and each anniversary year thereafter. Employee shall receive long-term disability benefits in accordance with Employer's Senior Executive plan and agrees to comply with the terms and conditions of such plan.

## Section VII

### Discontinuance of Business or Division as Termination of Employment

7.1  Notwithstanding anything in this agreement to the contrary, in the event that Employer or its affiliates shall discontinue operating the Division, then this agreement will terminate as of the last day of the month in which Employer ceases such operations.  In such a case, severance compensation and bonuses will apply, and the non-complete applicable to the Division's business only shall not apply to Employee.  This paragraph shall survive termination of this Agreement.

## Section VIII

### [Omitted.]

## Section IX

### Nondisclosure of Information Concerning Business, Non-Competition and Non-Solicitation

9.1  Confidential Information. Employee acknowledges and agrees that Employee has and will come into contact with, have access to and learn various technical and non-technical trade secrets and other Confidential Information, which are the property of Employer. Such Confidential Information includes but is not limited to methods, procedures, devices and other means used by Employer in the conduct of its business, marketing plans and strategies, pricing plans and strategies, data processing programs, databases, including, but not limited to plans and strategies relating to the design, marketing and pricing of Employer's products, all of which Confidential Information is not publicly available; names and addresses of Employer's customers and their representatives responsible for entering into contracts for Employer's services, customer leads or referrals, specific customer needs and requirements and the manner in which they have been met by

Employer, information with respect to pricing, costs, profits, sales, markets, plans for future business and other development, all of which Confidential Information is not available from directories or other public sources; and information with respect to Employer's employees, their names and addresses, compensation, experience, qualifications, abilities, job performance and similar information. All of the Confidential Information has been developed, acquired or compiled by Employer at its great effort and expense.

9.2 <u>Non-Disclosure of Confidential Information</u>. Employee acknowledges and agrees that any disclosure, divulging, revealing or other use of any of the aforesaid Confidential Information by the Employee, other than in connection with LollyTogs's business will be highly detrimental to the business of LollyTogs and serious loss of business and pecuniary damage may result therefrom. Accordingly, Employee specifically covenants and agrees to hold all such Confidential Information and any documents containing or reflecting the same in the strictest confidence, and Employee will not, both during employment with LollyTogs or thereafter, without LollyTogs's prior written consent, disclose, divulge or reveal to any person whomsoever, or use for any purpose other than the exclusive benefit of LollyTogs, any Confidential Information whatsoever, whether contained in the Employee's memory or embodied in writing or other physical form.

9.3 <u>Non-Solicitation of Customers and Business Contacts</u>. Employee acknowledges and agrees that during the course and solely as a result of his relationship with LollyTogs, he has and will become aware of some, most or all of LollyTogs' customers and clients, their names and addresses, their representatives responsible for purchasing LollyTogs' goods and/or services, their specific needs and requirements, and leads and referrals to prospective customers and clients, as well as suppliers, other employees and other business contacts with which LollyTogs has a business relationship (a "Business Contact"). Employee further acknowledges and agrees that the loss of such customers and clients or Business Contacts would cause LollyTogs great and irreparable harm. Consequently, Employee covenants and agrees that in the event of the termination of his relationship with LollyTogs, whether voluntarily or involuntarily, Employee will not, for a period of two (2) years following the date of termination, directly or indirectly solicit, for the purpose of selling or marketing similar goods and/or services to any customer, former customer or prospective customer of LollyTogs, or any Business Contact, with whom Employee came into contact while employed by LollyTogs. Employee shall not request or require any of the Business Contacts to cancel, reduce or otherwise modify any such business relationship.

9.4 <u>Non-Solicitation of Employees and Personnel</u>. Employee acknowledges and agrees that during the course of employment by LollyTogs, Employee has and may hereafter come into contact with some, most or all of LollyTogs's other employees or consultants, their knowledge, skills, abilities, salaries, commissions, benefits and other matters with respect to such employees not generally known to the public. Employee further acknowledges and agrees that any solicitation, luring away or hiring of such employees of LollyTogs will be highly detrimental to the business of LollyTogs and will cause LollyTogs serious loss of business and great and irreparable harm. Consequently, Employee covenants and agrees that during the course of employment by LollyTogs and for a period of three (3) years after termination of such employment (whether such termination is voluntary or involuntary), Employee shall not directly or indirectly, on behalf of Employee or another, solicit lure or hire any employees or consultants of LollyTogs of whom Employee became aware while employed by LollyTogs, or assist or aid in any such activity.

9.5 <u>Non-Competition.</u> Employee agrees that during the course of his employment with LollyTogs and for a period of two (2) years following the cessation of his employment with LollyTogs for any reason, he shall not, directly or indirectly, enter into or engage in the ownership, management, operation or control of, or act as an employee, advisor, consultant or contractor for any person, company or entity engaged in business similar to that of LollyTogs anywhere in the United States or Canada. This non-compete shall not apply to non-uniform apparel marketed to men and women.

9.6 <u>Conflict of Interest</u>. Employee may not use his position, influence, knowledge of Confidential Information or LollyTogs assets for personal gain. A direct or indirect financial interest, including joint ventures in or with a supplier, vendor, customer or prospective customer without disclosure and written approval from the President of LollyTogs, Ltd. is strictly prohibited and constitutes cause for dismissal and a claim for damages.

## Section X

### Commitments Binding on Employer Only on Written Consent

10.1    Anything contained in this agreement to the contrary notwithstanding, it is understood and agreed that Employee shall not have the right to make any contracts or commitments for or on behalf of Employer without the written consent (including email) of Employer.

## Section XI

### Contract Terms To Be Exclusive

11.1    This written agreement contains the sole and entire agreement between the parties and shall supersede any and all other agreements between the parties. The parties acknowledge and agree that neither of them has made any representation with respect to the subject matter of this agreement or any representations inducing its execution and delivery except such representations as are specifically set forth in this writing and the parties acknowledge that they have relied on their own judgment in entering into the same. The parties further acknowledge that any statements or representations that may have been made by either of them to the other are void and of no effect and that neither of them has relied on such statements or representations in connection with its dealings with the other.

## Section XII

### Waiver or Modification Ineffective Unless in Writing

12.1    It is agreed that no waiver or modification of this agreement or of any covenant, condition, or limitation contained in it shall be valid unless it is in writing and duly executed by the party to be charged with it, and that no evidence of any waiver or modification shall be offered or received in evidence in any proceeding, arbitration, or litigation between the parties arising out of or affecting this agreement, or the rights or obligations of any party under it, unless such waiver or modification is in writing, duly executed as above. The parties agree that the provisions of this paragraph may not be waived except by a duly executed writing.

## Section XIII

### [Omitted]

### Section XIII

### Miscellaneous

14.1    <u>Contract Governed by Law of State of New York.</u> The parties agree that it is their intention and covenant that this agreement and performance under it and all suits and special proceedings relating to it be construed in accordance with and under and pursuant to the laws of the State of New York and that in any action, special proceeding, or other proceeding that may be brought arising out of, in connection with, or by reason of this agreement, the laws of the State of New York shall be applicable and shall govern to the exclusion of the law of any other forum, without regard to the jurisdiction in which any action or special proceeding may be instituted.

14.2    <u>Severability.</u> If any term or provision of this Agreement or any portion thereof is declared illegal or unenforceable by any court of competent jurisdiction, such provision or portion thereof shall be deemed modified so as to render it enforceable, and to the extent such provision or portion thereof cannot be rendered enforceable, this Agreement shall be considered divisible as to such provision which shall become null and void, leaving the remainder of this Agreement in full force and effect.

14.3    <u>Enforcement of Covenants.</u> Employee acknowledges and agrees that compliance with this Agreement is necessary to protect the business and goodwill of LollyTogs and that any breach of this Agreement or any subparagraph hereof will result in irreparable and continuing harm to LollyTogs, for which money damages may not provide adequate relief. Accordingly, in the event of any breach or anticipatory breach of this Agreement by Employee, LollyTogs and Employee agree that LollyTogs shall be entitled to the following particular forms of relief as a result of such breach, in addition to any remedies otherwise available to it at law or equity: (a) injunctions, both preliminary and permanent, enjoining or restraining such breach or

anticipatory breach, and Employee hereby consents to the issuance thereof forthwith and without bond by any court of competent jurisdiction; and (b) recovery of all reasonable sums and costs, including attorneys' fees, incurred by LollyTogs to enforce the provisions of this Agreement.

14.4    <u>Survivorship of Benefits</u>. This agreement shall inure to the benefit of the Employer's successors and assigns.

14.5    <u>Authority.</u>  Employee warrants and represents that he has the authority to enter into this Agreement and that no other agreements, covenants, or representations affect in any way Employee's unfettered right to enter into this Agreement and to act in accordance herewith.

14.6    <u>Further Actions.</u>  From time to time from after the date hereof, each party, at its expense and without further consideration, will execute and deliver such documents to the other party as the other party may reasonably request in order to more effectively consummate the transaction contemplated herein.


IN WITNESS WHEREOF, the undersigned have executed this Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By      _____
        Richard Sutton


**Employee:**

VICTOR HARARY

# EXHIBIT "B"

This letter agreement is made the _28_ day of _September_ 2004, between LollyTogs, Ltd. whose principal office is at 100 West 33rd Street, Suite 1012, New York, New York 10001, ("Employer" or "LollyTogs"), and Victory Harary whose address is _____, _____, ("Employee"), and is made in conjunction with that certain Employment Agreement of the same date.

Re:    LollyTogs and Victor Harary Employment Agreement
       Side Letter: Business of Duty Free Manufacturers, Ltd.; Intellectual Property; Indemnity

1. The parties agree that as a condition to the Employment Agreement and the employment contemplated therein:

   a. The business heretofore owned by Employee, Duty Free Manufacturers, Ltd. of Red Bank, New Jersey ("DFM"), be dissolved and all agreements between it and Employer to this date which may obligate Employer in any way be terminated and released, such dissolution to be effective no later than thirty (30) days from the date set forth above, or promptly upon a judgment or settlement of the Haber Suit (as such term is defined in the Agreement).

   b. All intellectual property of Employee and DFM, including their trademarks, copyrights and designs set forth on the attached Exhibit A, be assigned to the Employer.

   c. All third party salesperson contracts involving DFM be disclosed to Employer for evaluation and assumption. Annexed hereto as Exhibit B is a list of all such agreements.

2. Employee represents and warrants that he is a shareholder of DFM and has authority to enter into the Agreement and to make the representations contained herein.

IN WITNESS WHEREOF, the undersigned have executed this Letter Agreement.

**Employer:**

LollyTogs, Ltd., Inc.
100 West 33rd Street, Suite 1012
New York, New York 10001
("Employer")

By    _____
      Richard Sutton    OK (JSB)

**Employee:**

VICTOR HARARY

7

# EXHIBIT "C"

**From:** Richard Sutton
**Sent:** Monday, June 18, 2007 7:13 AM
**To:** LTApparel
**Subject:** Official Work Wear / Global Uniform Services
**Importance:** High

After considerable review and analysis, LT Apparel Group has decided to discontinue the Official Workwear Division of our company and exit the professional work wear industry. This past Friday was the last day for most of the division's employees.

Someone will remain on staff for the next several months assisting with the liquidation of the remaining inventory and communicating with customers to ensure a flawless exit. While this was a very difficult decision, strategically, it makes the most sense for our company.

We wish all those affected lots of luck and success with their future endeavors.

Richard

# EXHIBIT "D"



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

## SEPARATION AGREEMENT

AGREEMENT made this 15th day of June, 2007 (hereinafter referred to as the "Agreement"), by and between Victor Harary (hereinafter referred to as "Harary"), and Lollytogs, Ltd. (hereinafter referred to as "Lollytogs" or the "Company").

### WITNESSETH:

WHEREAS, Harary has been employed by of the Company; and

WHEREAS, the Company and Harary now desire to end the employment relationship and the parties wish to resolve amicably all outstanding issues, rights and obligations by and between them and to embody those understandings in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the representations, promises and obligations herein contained, the parties hereto agree as follows:

1.      The parties agree that Harary's employment with the Company will terminate on June 30, 2007 (the "Termination Date"). The Company agrees to continue to pay Harary an amount equal to his salary at the current rate, on the Company's regular pay days, for a period of twelve months following the Termination Date. The Company will also pay Harary for any accrued but unused paid time off to which Harary is entitled as of the Termination Date. The parties also agree that the employment agreement, dated September 28, 2004, between Harary and the Company, is no longer of any force and effect, except that sections 9.1, 9.2, 9.3 and 9.4 shall survive the termination of the employment agreement.

31344918.1

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD  ®



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.3030
www.frenchtoast.com

2.      Harary understands that, as of the Termination Date, he will no longer be an employee of the Company, and that he will no longer be entitled to participate in any employee benefit or incentive plan maintained by the Company, including any medical, life or other insurance plan (except as allowed under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") with respect to continuation medical coverage). Notwithstanding the foregoing, the Company agrees that, to the extent that Harary elects continuation coverage under COBRA, the Company will pay on behalf of Harary the cost of the premiums for medical insurance for the six-month period following the Termination Date.

3.      Harary represents that as of the Termination Date, he will have returned all property of the Company, including but not limited to, any computers, telephones, documents, books, records (whether in electronic format or hard copy), reports, files, correspondence, notebooks, manuals, notes, specifications, mailing lists, credit cards and data in his possession or control.

4.      Harary, for himself and for the executors and administrators of his estate, his heirs, successors and assigns, hereby releases and forever discharges the Company and its officers, directors, employees and stockholders and the respective executors, administrators, heirs, successors and assigns of the foregoing, from any and all claims, actions, causes of action, suits, sums of money, debts, dues, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, demands or damages of any

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A   BETTER   LOOKING   WORLD



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303C
www.frenchtoast.com

nature whatsoever or by reason of any matter, cause or thing regardless of whether known or unknown at present, which against the Company or any of its officers, directors, employees or stockholders Harary ever had, now has or hereafter can, shall or may have for, upon, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to the date hereof including, but not limited to, any matter relating to or arising out of the employment of Harary or termination thereof under any contract, tort, federal, state or local fair employment practices or civil rights law including, but not limited to, Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the federal Family and Medical Leave Act, the New York State Human Rights Law, the New York City Human Rights Law, the New Jersey Law Against Discrimination, or any claim for physical or emotional distress or injuries, or any other duty or obligation of any kind or description, including any implied covenant of good faith and fair dealing, implied contract of permanent employment or the tortious or willful discharge of employment. The parties also agree that this Agreement does not either affect the rights and responsibilities of the Equal Employment Opportunity Commission to enforce the Age Discrimination in Employment Act, or justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the Equal Employment Opportunity Commission under the Age Discrimination in Employment Act. In the event the Equal Employment Opportunity

31344918.1

3

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  BETTER  LOOKING  WORLD

**LOLLYTOGS**®

FRENCH TOAST LTD.

SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303(
www.frenchtoast.com

Commission commences a proceeding against the Company in which Harary is a named party, Harary agrees to waive and forego any monetary claims which may be alleged by the Equal Employment Opportunity Commission to be owed to Harary. The parties also agree that nothing in the provisions of this paragraph 4 is intended to limit their rights under and concerning enforcement of this Agreement.

5.    Harary represents that he is unaware of any facts that could form the basis of a claim either (i) by the Company against him, or (ii) by a third party against the Company. Based upon such representation, the Company releases and forever discharges Harary, his executors and administrators of his estate, and his heirs, successors and assigns, from any and all claims, actions, causes of action, suits, sums of money, debts, dues, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, demands or damages of any nature whatsoever or by reason of any matter, cause or thing regardless of whether known or unknown at present, which against Harary, his executors and administrators of his estate, and his heirs, successors and assigns, which the Company ever had, now has or hereafter can, shall or may have for, upon, or by reason of, any matter, cause or thing whatsoever from the beginning of the world to the date hereof.

6.    Harary agrees to keep confidential the terms of this Agreement and not to disclose any term of this Agreement to any other person or entity, except for Harary's family, accountants and attorneys. In the event that Harary is required by law to disclose any

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A BETTER LOOKING WORLD



SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303(
www.frenchtoast.com

term of this Agreement, Harary agrees to give the Company ten days' written notice prior to any such disclosure, or such shorter time period as mandated by law or is otherwise practicable.

7.    Harary shall not make any statements, either directly or through other persons or entities, which are disparaging to the Company or any of its affiliates, management, officers, directors, services, products, operations, prospects or other matters relating to the Company's businesses. The Company, through its officers and directors, shall not make any statements, either directly or through other persons or entities, which are disparaging to Harary.

8.    The Company has advised Harary to consult with an attorney prior to executing this Agreement. By executing this Agreement, Harary acknowledges that (a) he has been provided an opportunity to consult with an attorney or other advisor of his choice regarding the terms of this Agreement, (b) this is a final offer and Harary has been given twenty-one (21) days in which to consider whether he wishes to enter into this Agreement, (c) Harary has elected to enter this Agreement knowingly and voluntarily and (d) if he does so within fewer than twenty-one (21) days from receipt of the final document he has knowingly and voluntarily waived the remaining time. The Company reserves the right to change or revoke this Agreement prior to Harary's execution hereof. This Agreement shall be fully effective and binding upon all parties hereto immediately upon execution of this Agreement

31344918.1

5

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A BETTER LOOKING WORLD

**LOLLYTOGS®** FRENCH TOAST LTD.

SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303(
www.frenchtoast.com

except as to rights or claims arising under the ADEA, in which case Harary has seven (7) days following execution of this Agreement to change his mind (the "Revocation Period").

9.    Any notice to be given hereunder shall be in writing and shall be deemed given when mailed by certified mail, return receipt requested, addressed as follows:

To Harary at:    Victor. Harary
105 Hollywood Avenue
West Long Branch, NJ 07764-1836

With a copy to:

To the Company at:    Lollytogs, Ltd.
100 West 33rd Street
Suite 1012
New York, New York  10001

Attention:  C.E.O.

With a copy to:    Sheldon Nussbaum, Esq.
Fulbright & Jaworski L.L.P.
666 Fifth Avenue, 31st Floor
New York, New York  10103

or at such other address as may be indicated in writing by any party to the other parties in the manner provided herein for giving notice.

10.    In the event that any one or more of the provisions of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.  This Agreement will survive the termination of any arrangements contained herein and is binding on and will

31344918.1

6

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A   B E T T E R   L O O K I N G   W O R L D

**LOLLYTOGS**
**FRENCH TOAST** LTD.

SHOWROOM & BUYING OFFICE • 100 W. 33rd St., Suite 1012
New York, NY 10001-2900 • Tel: 212.502.6000 • Fax: 212.594.303(
www.frenchtoast.com

inure to the benefit of each of the parties and their respective affiliates, heirs, executors, administrators, successors and assigns.

11.    This Agreement shall be governed by the substantive laws of the State of New York, without giving effect to any principles of conflicts of law.

12.    Each of the parties agrees to do and perform or cause to be done and performed all further acts and shall execute and deliver all other documents necessary on its part to carry out the intent and accomplish the purposes of this Agreement and the transaction contemplated hereby.

13.    This Agreement sets forth the entire agreement between the parties hereto concerning the subject matter hereof and may not be changed without the written consent of each of the parties.

IN WITNESS WHEREOF, the parties have each executed this Agreement as of the date first written above.

Lollytogs, Ltd.

By: _____
Name: Richard Sutton
Title: C.E.O.

_____
Victor Harary

31344918.1                                        7

ACCOUNTING OFFICE & DISTRIBUTION CENTER • 321 Herrod Blvd. • P.O. Box 1001 • Dayton, NJ 08810-1001
Tel: 732.438.5500 • Fax: 732.438.6979

A  B E T T E R   L O O K I N G   W O R L D

# EXHIBIT "E"

Official Workwear - Supplier of Premium Uniform for the Industrial Laundry Market                    Page 1 of 1



 

LT Apparel Group has discontinued the
Official Work Wear division, as of June 15, 2007.
Please call 1-800-400-0309 for 50% off Discounts on all our existing merchandise.



**ALL COVERALLS  CC14 AND CC16  $19.00**
COLORS: NV, PB, OR, WH
SIZES: SIZES 36-60 REGULAR AND LONG



**ALL COTTON SHIRTS SC30 AND SC40 $9.95**
COLORS: KH, LB, PB, WH, NV, GG
SIZES: S-6X REGULR AND LONG



**PC10** *$11.95* **,PC12** *$13.95,* **AND PC20** *$12.95*
COLORS AVAILABLE: NV, KH CH, BK
SIZES 30-54 INSEAMS 30-37U



SP24    SP26    SP14
**ALL POLY COTTON SHIRTS $6.95**



**PT10** *$10.95* **PT56** *$10.95* **PT20** *$9.95* **PT60** *$10.00*

**ALL ITEMS 50% OFF!!!!**
*Act now while inventory is available.*
**Don't miss this Great Opportunity to increase your bottom line profits!**